# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

JICARILLA APACHE NATION,

       Plaintiff,

vs.                                                                                          No. CIV 02-1470 JB/RLP

RIO ARRIBA COUNTY; MOISES MORALES,
Rio Arriba County Commissioner; LORENZO VALDEZ,
Rio Arriba County Manager; AGAPITO CANDELARIA,
Rio Arriba County Chief Appraiser; and UNKNOWN
JOHN AND JANE DOES, each in both his or her
official and individual capacities; ANDREW CHAVEZ,
Rio Arriba County Commissioner; ELIAS CORIZ,
Rio Arriba County Commissioner; and ARTHUR
RODARTE, Rio Arriba County Assessor, each in his
official capacity only; and ALFREDO MONTOYA, RAY
TAFOYA, and DAVID SALAZAR, each in his individual
capacity only,

       Defendants.

## <u>MEMORANDUM OPINION</u>

**THIS MATTER** comes before the Court on: (i) the Defendants' Motion for Summary

Judgment, filed April 15, 2003 (Doc. 19); and (ii) the Plaintiff's Motion for Partial Summary

Judgment, filed on July 14, 2003 (Doc. 32).  The primary issue is whether the Plaintiff, Jicarilla

Apache Nation (the "Nation"), has shown evidence of a constitutional violation of discriminatory tax

treatment to overcome the individual Defendants' assertion of qualified immunity from the claims

brought against them in their individual capacities.  Because the Court finds that the Nation has not

produced evidence of a constitutional violation and that the individual Defendants are thus entitled

to qualified immunity, the Court denies the Nation's motion, grants the individual Defendants' motion

and dismisses the § 1983 claims against the individual Defendants in their individual capacities.[1]

## FACTUAL BACKGROUND

The United States recognizes the Nation, formerly known as the Jicarilla Apache Tribe, as a sovereign Indian tribe with corresponding legal rights and responsibilities. See Jicarilla Apache Tribe v. New Mexico, 742 F. Supp. 1487, 1487 (D.N.M. 1990); 25 U.S.C. § 476; 67 Fed. Reg. 46,328 - 29 (July 12, 2002). The Nation is eligible for special programs and services that the United States provides because of its status as an Indian tribe. See 25 U.S.C. §§ 461-494. It possesses sovereign powers including self-government. See id. at § 476.

### 1.    The Property

The Nation alleges that the Defendants violated the Nation's constitutional rights by revaluing the Nation's property for tax purposes. The property at issue is one tract of land containing 32,075.80 acres known as the Lodge at Chama Ranch (the "Ranch"). See Complaint for Violation of Civil Rights Pursuant to 42 U.S.C. §§ 1983 and 1985 ¶ 7, at 3, filed November 21, 2002 (Doc. 1)("Complaint"). The Nation purchased the Ranch in June 1995. See Trustee Deed from Chama Land and Cattle Co., Inc. to Jicarilla Apache Tribe (June 5, 1995).

The Ranch consists of two parcels of land, but is not otherwise subdivided in any way. See id., attached Description of Land at 1, 10. Located within the Ranch are two Class A game parks containing 3,200 acres each. See Affidavit of Frank Y. Sims (President and General Manager of the Lodge at Chama) ¶ 9, at 3. The State of New Mexico licenses the two game parks. See id.

---

[1] The Court has previously entered an Order denying the Nation's motion, granting the individual Defendants' motion, and dismissing the claims against the individual Defendants in their individual capacities with prejudice. See Amended Order, filed March 31, 2004 (Doc. 86). This opinion is intended to explain more fully the Court's reasoning for its previous Order.

Rio Arriba County has subjected one of the parcels to the disputed tax treatment.  See In the Matter of the Protest of the Jicarilla Apache Tribe, d/b/a The Lodge at Chama, Decision and Order, Findings of Fact ¶ 3, at 2 (Rio Arriba County Valuation Protests Board February 12, 2000)("Decision and Order").  A commercial lodge structure is located on the disputed parcel, which the Nation in 2000 proposed to expand.  See Sims Aff. ¶ 18, 19, at 6-7; In the Matter of the Protest of the Jicarilla Apache Tribe d/b/a The Lodge at Chama, Transcript of Proceedings, Testimony of Ronald Smith at 84-85, 117, 122-23 (December 21, 2000)("Transcript").  The lodging facilities at the Ranch lie within the Ranch's separately classified and valued portion, which is the subject of the disputed tax treatment.  See In re Valuation for The Lodge at Chama, Owner No. 0002924, Property Code No 1-021-171-264-264, Stipulation ¶¶ 6(h), 10, at 3, 4 (Rio Arriba County Valuation Protests Board).

## 2.    The BIA Letter

In May 1996, the Nation submitted a letter to the United States Bureau of Indian Affairs ("BIA") formally requesting that the United States acquire title to the Ranch in trust for the Nation pursuant to federal law.  See Letter from Leonard Atole, President, Jicarilla Apache Tribe, to Area Director, Albuquerque Area Office, BIA (May 7, 1996).  In June 1996, Lorenzo Valdez, acting in his capacity as County Manager, submitted a letter to the BIA objecting to the United States' proposed acquisition of the Ranch in trust for the Nation.  See Letter from Lorenzo Valdez, County Manager, and Patricio Garcia, Planning and Zoning Director, Rio Arriba County, to BIA Jicarilla Agency (June 14, 1996).  Among other arguments, Valdez asserted that trust status for the Ranch would harm the County by removing the Ranch from the property tax roles, that the then-current annual property taxes on the Ranch were based on an old land value assessment of $6 million, and that a new assessment should have been performed based on the Ranch's purchase price of $25

million and comparable sales, so that the property taxes on the Ranch "would have increased significantly." See id.

In October 1999, the BIA issued a letter to the Nation and sent a copy to Rio Arriba County. See Letter from the BIA to the Nation (October 28, 1999)("BIA Letter").  The letter approved federal acquisition of the Ranch in trust for the Nation pursuant to federal law. See id.  In November or December, 1999, the Rio Arriba County Assessor, David Salazar, learned of the BIA Letter. See BIA Letter; Transcript, Testimony at 80:11-14.  The BIA Letter addressed the property's plans, goals, and purposes. See BIA Letter; Transcript,  Testimony of Agapito Candelaria in his capacity as an Appraiser for the County at 80:11-14.

While the BIA Letter does not classify any income generated at the Ranch as agricultural versus non-agricultural, Salazar and Candelaria were able to determine from the letter that, in 1997, the property had generated non-agricultural income of $1,109,575.00 versus agricultural income of $214,500.00. See BIA Letter; Transcript, Candelaria Testimony at 80:11; id. at 81-82.  Non-agricultural activities generated eighty-four percent (84%) of the total income for 1997 and agricultural activities generated sixteen percent (16%) of the total income.  See BIA Letter; Transcript, Candelaria Testimony at 80:11-14.  Salazar considered the BIA Letter to present reliable information, because its source is a federal government agency, reporting on the property owner's behalf. See BIA Letter; Transcript, Candelaria Testimony at 80:11-14.  The Nation disputes that the BIA Letter constitutes, under state law, a report on the Nation's behalf for purposes of property reclassification, because the Nation did not write it, and expressly indicated that the Nation "plan[ned] to continue using the Ranch for . . . the same purposes for which the former owners used the Ranch[, s]o the land use will remain unchanged[.]" BIA Letter at 7; 3.6.5.27(A)(5) NMAC (2003).

### 3. The IBIA Appeal

In November 1999, Valdez, acting in his capacity as County Manager, filed an administrative appeal on behalf of the County with the Interior Board of Indian Appeals ("IBIA") of the United States Department of the Interior concerning the BIA decision approving federal acquisition of the Ranch in trust for the Nation.  See Letter from Valdez to IBIA (November 22, 1999).  In that letter, Valdez asserted that the assessed value of the Ranch for property tax purposes should be $123,981, such that the County would lose over $1.3 million in property tax revenues over ten years if the trust acquisition approval were upheld.  See id. at 5.

In support of the IBIA appeal, Defendants Alfredo Montoya, Ray Tafoya and Moises Morales, acting in their capacities as County Commissioners, approved a County Commissioners Resolution which declared the County's opposition to federal acquisition of the Ranch in trust for the Nation and delegated authority to Valdez to appeal the BIA's trust acquisition approval.  See Rio Arriba Board of County Commissioners Resolution 2000-26, "A Resolution to Protest the Bureau of Indian Affairs Recommendation to Transfer Fee to Trust Land by the Jicarilla Tribe" (November 23, 1999).  In support of the appeal, the County submitted to the IBIA, and relied upon, a February 2000 letter by Candelaria, issued in his capacity as Chief Appraiser for the County pursuant to Valdez' request, which asserted a property valuation and estimated corresponding property taxes for the Ranch for the 2000 tax year.  See Appellant's Opening Brief, Rio Arriba, N.M., Board of County Comm'rs v. Southwest Regional Director, BIA, No. IBIA 00-27-A (IBIA March 6, 2000); Letter from Candelaria to Valdez (February 28, 2000).  In his February 2000 letter, Candelaria stated that the Ranch had been assessed for property tax purposes for the 2000 tax year based on its purchase price or market value, that in that assessment over 32,000 acres of the Ranch were classified as

"miscellaneous non-residential" land, and that the 2000 property taxes on the Ranch should be approximately $152,000.  See Letter from Candelaria to Valdez (February 28, 2000).  The Nation contends that Candelaria made these assertions in February 2000 even though the Assessor was not required to issue notices of valuation to property owners for that year until April, see NMSA 1978 § 7-38-20(A), and the Assessor did not issue the Ranch's notice of valuation to the Nation until June 2000, see Rio Arriba County, Notice of Valuation, Owner No. 2924 (2000)("Initial 2000 Valuation"); Rio Arriba County, Corrected Notice of Valuation, Owner No. 2924 (received June 23, 2000)("Corrected 2000 Valuation").  The Nation contends that Candelaria's letter did not justify or explain any grounds for revoking the Ranch's prior grazing and irrigated land classifications and valuations.

> 4.    **The Reclassification**

Before the Nation's purchase of the Ranch in 1995, Rio Arriba County, through Salazar, had consistently classified over 30,000 acres of the Ranch as agricultural grazing land with a taxable value of $2.00 per acre.  See Rio Arriba County Notice of Valuation, Owner No. 2924 (1994).  In February 1996, the Nation's General Manager for the Ranch, Frank Sims, met with Candelaria and submitted, on the Nation's behalf, an agricultural land application in compliance with state law.  See NMSA 1978, § 7-36-20(F); Rio Arriba County Agricultural Land Application & Livestock Owners Report (February 27, 1996)("Application").  That application declared 30,826.8 acres of the Ranch as grazing land for property tax purposes and 1,234 acres of the Ranch as irrigated land, and declared 600 head of privately owned elk as livestock.  See Application.

In 1996, Candelaria, on Salazar's behalf, classified for property tax purposes 30,827 acres of the Ranch as grazing land valued at $6 per acre at full value; and classified 1,234 acres of the Ranch

as irrigated land valued at $165 per acre at full value; and classified the 600 privately owned elk at the Ranch as livestock.  See Rio Arriba County, (Tentative) Notice of Valuation, Owner No. 2924 (1996).  Between 1996 and 1999, the County, through Salazar, consistently classified and valued for property tax purposes 30,827 acres of the Ranch as grazing lands worth $6 per acre at full value (or $2 per acre taxable value); 1,234 acres of the Ranch as irrigated land valued at $165 per acre at full value (or $55 per acre taxable value); classified the Nation's private elk at the Ranch as livestock; and levied *ad valorem* livestock taxes on them as livestock.  Rio Arriba County has consistently recognized that there has been no material change in the Ranch's use since the county approved the Nation's agricultural land application in 1996.  See In re Valuation of the Lodge at Chama, Stipulation ¶ 10, at 2 (Rio Arriba County Valuation Protests Board March 13, 2003).  Salazar valued the property for tax years 1997, 1998, and 1999 as follows: (i) 1997 at $773,103.00, see 1997 Statement from Rio Arriba County Assessor's Office; (ii) 1998 at $773,893.00, see 1998 Statement from Rio Arriba County Assessor's Office; and (iii) 1999 at $773,893.00, see 1999 Statement from Rio Arriba County Assessor's Office.

In 2000, Salazar's initial valuation classified the property as miscellaneous non-residential property and thus formally revoked the Ranch's grazing and irrigated land classifications and valuations.  See Initial 2000 Valuation.  In June 2000, Salazar issued an amended notice of valuation for the 32,075.80 acre-property.  See Corrected 2000 Valuation.  Salazar determined that the activities on the property of trophy elk hunting, big game parks, sport fishing, clay shooting, hiking, cross country skiing, restaurant, lodge, and corporate facilities were non-agricultural uses.  See Assessor's Proposed Findings of Fact and Conclusions of Law ¶ 15, at 4 (January 10, 2001)("Proposed Findings").  The corrected notice of valuation for the Ranch restored small portions

of the grazing and irrigated land classifications.  See Corrected 2000 Valuation.  Both the initial and corrected valuations revoked the pre-2000 classifications and valuations for the majority of the Ranch, from grazing land valued at $6 per acre at full value (or $2 per acre taxable value) and irrigated land valued at $165 per acre at full value (or $55 per acre taxable value) to "miscellaneous non-residential" land valued at $664 per acre at full value (or $221.34 per acre taxable value).

Some time around the change in classification from agricultural to miscellaneous, Salazar discovered internet web-sites advertising the Ranch as "one of the world's foremost outdoor recreational retreats," with "internationally renowned hunts," "fine dining and cuisine every meal of the day," and other attractive outdoor recreational activities.  Transcript, Candelaria Testimony at 93:13-20; web-site pages.  The web-sites lent support to Salazar's finding that the primary use of the Ranch was non-agricultural in nature.  See Proposed Findings ¶¶ 7-8, at 3.  During the protest period, Salazar also obtained a promotional video of the property, which touted the various recreational activities available for its paying guests.  See Transcript, Candelaria Testimony at 96-100; promotional video.

The Nation contends that Salazar did not discover or examine the Ranch's web-site until after reclassifying the majority of the Ranch for property tax purposes.  See Transcript at 63-64, 120-21.  Additionally, the web-site did not provide any information about the nature of the primary use of the disputed land at the Ranch or indicate that it was primarily non-agricultural.  See web-site pages.  A witness for Salazar admitted that the web-site alone "would not have been compelling enough to change the use" classification.  Transcript at 63.

Salazar first viewed the Ranch's promotional video after the change in classification, and the video did not provide any information about the primary use of the disputed land at the Ranch.  See

Transcript at 96-99.  Salazar's attorney, in introducing it, admitted that it was not intended to "represent . . . all that's happening at the ranch, because obviously there's a lot more going on at the ranch than just what the video shows."  Id.

The Defendants contend that Salazar's office considered and relied on the web-site and the video in reclassifying the disputed land at the Chama Ranch.  See Decision and Order, Findings of Fact ¶ 7-8, at 4; Transcript at 96-100.  That office recognizes, however, that advertising is irrelevant to land classifications for property tax purposes.  See In re Valuation of Mossman Ranch & Lodge at Chama, Consolidated Hearing Transcript at 167.

Salazar determined that the timber and the cattle grazing economic activities were bona fide agricultural activities, but were not the property's primary use.  See Proposed Findings ¶ 14, at 4. The Nation contends that this conclusion was a factual finding that Salazar proposed but that there was no evidence at the administrative hearing on Salazar's reclassification of the majority of the Ranch which demonstrated that timber production and cattle grazing were not the primary uses of the Ranch.  Rather, evidence introduced at that hearing demonstrated that timber production was the single largest income-generating activity at the Ranch in 2000.  See Decision and Order, Findings of Fact ¶ 17, at 6.  Moreover, because of low overhead, timber production is the Ranch's most lucrative activity, and timber production and cattle grazing at the Ranch are the most lucrative in terms of maintaining a positive net income, as opposed to all other activities at the Ranch, which have very heavy operating expenses.  See Transcript at 217.

The Nation asserts that the County, through Salazar and Candelaria, has continued to classify and value the Ranch for each successive tax year since 2000 based on the 2000 reclassification and revaluation, resulting in an average of $126,258.57 in asserted property taxes on the Ranch for tax

years 2000, 2001 and 2002.  This represents an increase of over $110,500, or over 700%, from the 1996-1999 average annual property taxes on the Ranch.

The Nation contends that the County has based its classifications and valuations of the Ranch since 2000 in part on income generated within the separately classified and assessed parcel that is the subject of the disputed tax treatment at the Ranch.  The Nation further contends that this practice conflicts with state law, see NMAC 3.6.5.8(B), and that the County does not employ the same practice with regard to other similar properties within the County.  The Defendants assert that the County's practice with regard to income that the Ranch generates does not conflict with state law.  NMAC 3.6.5.8(B) states "multiple use properties shall be classified according to their individual components if it is possible to separate the property into discrete entities.  If it is not feasible to separate a multiple use property into discrete entities, then that property shall be classified according to the predominant use of the property."  The Defendants contend that Salazar followed the guidance in this administrative regulation.

5.     **Assessor Learns of State's Position on Elk**

The Defendants assert that Salazar in years before tax year 2000 had mistakenly assessed the Nation's privately owned elk herd on the property as livestock.  See 1997 Statement from Rio Arriba County Assessor's Office; 1998 Statement from Rio Arriba County Assessor's Office; 1999 Statement from Rio Arriba County Assessor's Office.  The Nation contends that such assessment was not a mistake, but was necessarily correct, relying on the New Mexico Court of Appeals' recent holding that there was "no reasonable basis for considering the herd to be anything other than livestock[.]" Jicarilla Apache Nation v. Rio Arriba County Assessor, No. 22,336, 2004-NMCA-055, ¶ 33, 92 P.3d 642, 651.

Candelaria attended an Assessors' Affiliated Workshop where he learned that elk are not classified as livestock under the Property Tax Code. <u>See</u> Transcript, Candelaria Testimony at 76-77, 91-92. Salazar, in tax year 2000, stopped assessing *ad valorem* livestock taxes on the privately owned elk. The Property Tax Division General Order No. 99-25 entitled "Tax Year 2000 Value of Livestock for Property Taxation Purposes Pursuant to Section 7-36-31 NMSA 1978," does not list elk among the enumerated livestock. <u>See</u> Decision and Order, Findings of Fact ¶ 23, at 7. The New Mexico Court of Appeals has, however, rejected reliance on Order 99-25 for reclassification of the Nation's private elk, finding that "the absence of an animal from the Order cannot be deemed conclusive or even to provide guidance" in determining whether an animal constitutes livestock under the Property Tax Code. <u>See</u> <u>Jicarilla Apache Nation v. Rio Arriba County Assessor</u>, 2004-NMCA-055, ¶ 29, 92 P.3d at 650.

### 6.    The Protests Board

The Nation protested the reclassification before the Rio Arriba County Valuation Protests Board. The Valuation Protests Board is a statutorily created body that is separate from the Defendants in this case. <u>See</u> NMSA 1978, § 7-38-25. It consists of three voting members and three alternates; the Board of County Commissioners appoints two voting members and two alternates[2], while the third member and alternate are property appraisal officers that the Taxation and Revenue Department employs. <u>See</u> <u>id.</u> § 7-38-25(A). The Department's appointee serves as Chairman. <u>See</u> <u>id.</u> § 7-38-25(A)(3). County valuation protests boards are quasi-judicial bodies. <u>See</u> <u>Addis v. Santa</u>

_____

[2] The County's appointees must be voters in the county, and one member and one alternate must have demonstrated experience in the field of valuation of property. <u>See</u> NMSA1978, § 7-38-25(A)(1), (2). The appointments are for a two year term. <u>See</u> <u>id.</u> Members and alternates may not hold any elective public office nor otherwise be employed by the state, a political subdivision, or a school district. <u>See</u> <u>id.</u> § 7-38-25(B).

Fe County Valuation Protests Board, 91 N.M. 165, 167, 571 P.2d 822, 824 (1977).  Thus, the Defendants sued in their capacity as County Commissioners have the authority to appoint members of the Valuation Protests Board, although the record before the Court does not indicate what relationship, if any, these Defendants had with the members of the Rio Arriba County Valuation Protests Board which heard the Nation's complaint.

By stipulation, Salazar and the Nation agreed that the case should be heard procedurally pursuant to NMSA 1978, § 7-36-20A, wherein the presumption is created that the subject property continues to be entitled to its previous agricultural classification and valuation.  See In re Valuation of the Lodge at Chama, Stipulation ¶ 3, at 1 (Rio Arriba County Valuation Protests Board January 30, 2004).  Salazar elected to proceed under 3.6.5.27(A)(6) NMAC ("When the owner of land has not reported that the use of the land is no longer primarily for agricultural purposes but the county assessor has evidence sufficient to rebut the presumption in Subsection A of Section 7-36-20, the county assessor must change the classification of the land.").

The standard promulgated in regulation 3.6.5.27(A)(6) NMAC is a "sufficient" or "substantial" evidence standard.  See Duke City Lumber Co. v. New Mexico Environmental Improvement Board, 101 N.M. 291, 293, 681 P.2d 717, 719 (1984)(holding that, unless the Legislature specifies the standard, the New Mexico courts follow the rule of "substantial evidence"); Black v. Bernalillo County Valuation Protests Bd., 95 N.M. 136, 139, 619 P.2d 581, 584 (Ct. App. 1980)(indicating that "sufficient evidence" is synonymous with "substantial evidence").  The Rio Arriba County Valuation Protests Board affirmed Salazar's decision to reclassify the property.  The threshold issue which the Protests Board decided in Salazar's favor was that he had "sufficient evidence" to justify a change in classification from agricultural to miscellaneous.  The Protests Board

-12-

held that the property does not qualify for the special method of valuation of the land used primarily for agricultural purposes under NMSA 1978, § 7-36-20.

The Protests Board made a finding of fact, based on the Nation's evidence at the protest hearing, that, in 1998, non-agricultural income was $1,340,864.00 versus agricultural income of $302,592.00; thus, eighty-two percent (82%) of the total income for 1998 was non-agricultural, while eighteen percent (18%) of the total income was agricultural. See Decision and Order, Findings of Fact ¶ 38, at 10. The Protests Board determined that, in 1999, non-agricultural income was $1,526,951.00 and agricultural income was $299,093.00; eighty-seven percent (87%) of the total income for 1999 was non-agricultural income, while thirteen percent (13%) of the total income was agricultural income. See id., Findings of Fact ¶ 39, at 10. The Protests Board determined that, as of December 7, 2000, the Nation had generated for the tax year 2000 non-agricultural income in the amount of $1,191,279.00 and agricultural income of $566,357.00; sixty-eight (68%) of the total income was non-agricultural income, while thirty-two percent (32%) was agricultural income. See id. Findings of Fact ¶ 40, at 11. The Protests Board reproduced these findings verbatim from Salazar's proposed findings in the valuation protest. Compare id., Findings of Fact ¶¶ 38-40, at 10-11, with Proposed Findings ¶¶ 37-39, at 7-8.

The Protests Board determined that the property had been used in 1991, 1992, and 1993 for commercial sheep grazing, which was suspended in 1994. See Decision and Order, Findings of Fact ¶ 17, at 6. The Protests Board found that there was no intent on the Nation's part to resume this activity. See id. The Nation contends that there has not been evidence that the Nation did not intend to resume sheep grazing at the Ranch. Instead, that land has been left fallow to recover from overgrazing, and it has not been feasible to resume sheep grazing there because of "recent drought

-13-

conditions, fire danger, and other considerations." Sims Aff. ¶ 8, at 3. Moreover, the County

recognized that leaving land lie fallow, as the Nation has done following sheep grazing at the Ranch,

constitutes a valid agricultural use. See Proposed Findings, Findings of Fact ¶ 16, at 4; Transcript,

Candelaria Testimony at 128-129; 3.6.5.27(A)(1)(c) NMAC (2003). The Nation contends that

Candelaria did not consider that fact when analyzing land uses at the Ranch in the 2000 property

reclassification. See Transcript at 107-108. The County conceded in an administrative appeal

concerning the BIA Letter that the Nation's use of the Ranch "was the use of the property by the

prior owner." Rio Arriba, N.M., Board of County Comm'rs v. Southwest Regional Director, BIA,

Appellant's Opening Brief at 2, No. IBIA 00-27-A (Interior Board of Indian Appeals March 6, 2000).

The County has relied on the use of and income from the separately classified and valued

portion of the Ranch to reclassify the separate disputed portion of the Ranch. See Decision and

Order, Findings of Fact ¶ 15, at 5. The Nation contends that the use of one portion of a property is

legally irrelevant to classification and valuation of a separate portion of that property under state law.

See 3.6.5.8(B) NMAC (2003) ("Multiple-use properties shall be classified according to their individual

components[.]"). Moreover, the Nation asserts that the County has not similarly considered the use

of or income from one portion of a property for determining the classification of another portion of

the same property for any other land owner in the County. See In re Valuation of Mossman Ranch

and the Lodge at Chama, Consolidated Hearing Transcript at 256-58 (Rio Arriba County Valuation

Protests Board, Tax Protests Nos. 2-002-10 & 2-002-11 March 19-20, 2003).

### 7.   Smith's Testimony

Ron Smith, a Rio Arriba appraiser and sales ratio analyst, testified at the December 21, 2000

hearing that the "revelation" about the property in the BIA Letter led to the change of classification

from agricultural to miscellaneous:

> The major – or the impetus behind this change was a letter that we received from the Bureau of Indian Affairs to Mr. Vicenti, the president of the Jicarilla Tribe.
>
> And upon our office reviewing that letter, we came across some significant, to us, revelations about the activities that were going on at The Lodge and the nature of the revenue which were being generated, which caused us to question our original classification.

Transcript, Smith Testimony at 27:7-16; id. at 29:21 - 30:11.  Smith testified about his reading and understanding of the BIA Letter and its significance in leading to the change in classification from agricultural to miscellaneous, including the following observations on the BIA Letter.  The Nation denies that there were any revelations about the Ranch in the BIA Letter that supported a finding of change in use or revoking its agricultural classification.  See BIA Letter at 7 (indicating that the Nation "plan[ned] to continue using the Ranch for . . . the same purposes for which the former owners used the Ranch[, s]o the land use will remain unchanged[.]"); id. at 10-11.

### a.    Name Change

Smith noted the name change from "Chama Land & Cattle Company" to "The Lodge at Chama," and that it "signified a change of emphasis on the purpose of the ranch."  Transcript at 32:21 - 33:7.  Smith also noted that "[t]he Chama Land & Cattle Company represented a working ranch," while counting the "Lodge" as "recreational type activities."  Id.  The Nation contends, however, that the change of the name for the Ranch from "Chama Land and Cattle Company" to "Lodge at Chama" could not have played any role in interpreting the 1999 BIA Letter, because Salazar's staff had known about the lodge since 1980, about 20 years; the name change took place at least nine years earlier, in 1989 or 1990; Salazar's office had been aware of the newer name since shortly after the Nation purchased the Ranch in June 1995; and both names have appeared on a sign over the entrance to the

-15-

Ranch at least since that time.  See id. at 48-49, 137-38; Trustee Deed at 1-2 (June 5, 1995).

### b.   Additional Needs

Smith noted the section of the BIA Letter entitled "The Need for Additional Land" and said: "Primarily, this ranch will provide additional land, lodging, and facilities for expansion of the Tribe's renowned big game hunting operation."  Transcript, Smith Testimony at 34:1-12.  He also testified:

> Q.      What does that signify, as far as you're concerned?  Why is that important?
>
> A.      To me, it is important in that, first of all, the word "primarily" shows the importance that's being given this.   "The world renowned big game hunting operation."  I construed that to mean that it's another recreational reference.

Id. 34:1-12; BIA Letter.  The Nation contends, however, that the Defendants could not have considered the discussion in the BIA's Letter about the "need for additional land" as evidence of a land use change that would justify revoking the agriculture land classification for the majority of the Ranch, because the next sentence of the BIA Letter noted that the Ranch "contains some agricultural lands and water rights."  BIA Letter at 3.

### c.   Luxury Resort

Smith noted that the Nation described the property as "a highly successful luxury resort" and planned the construction of "an additional lodge facility on the property."   Transcript, Smith Testimony  at 34:19 - 35:1.  He also noted that this construction was "not just a renovation or expansion of the current lodge but another new lodge."  Id.  The Nation argues that the BIA's discussion of "a highly successful luxury resort" at the Chama Ranch could not have evidenced any land use change that would justify revoking the agricultural land classification for a separate portion of the Ranch, because the same paragraph of the Letter also noted that "the Ranch will provide additional livestock grazing capacity . . . and contains valuable agricultural land[.]"  Id.  Also,

Salazar's staff had known about the nature of the lodging and other public activities at the Ranch since at least 1980.  See Transcript at 48.  Finally, the BIA Letter only referenced a lodge expansion, not an additional lodging facility.  See BIA Letter at 3.

### d.    Big Game Hunting

Smith noted the statement that the two game parks "will continue to be marketed worldwide for big game hunting."  Transcript, Smith Testimony at 35:5-7.  The Nation argues, however, that the reference in the BIA's Letter to marketing for the game parks at the Chama Ranch could not have evidenced any land use change that would justify revoking the agricultural land classification for the majority of the Ranch, because advertising is irrelevant to land classification for property tax purposes.  See Transcript at 167.

### e.    Fees/Charges

Smith noted the "lodge currently charges $200 per person per night" and the activities included with the lodge are "hunting, fishing, equestrian, sporting places," "and those are charged for as a separate fee."  Transcript, Smith Testimony at 35:24 - 36:3.  Again, the Nation argues that the Defendants could not have considered the reference in the BIA's Letter to charges for public lodging and other activities at the Chama Ranch to be evidence about any land use change that would justify revoking the agricultural land classification for the majority of the Ranch outside of the separately classified and valued homesite underlying the lodge structure.  The Nation contends that the use of one portion of a property is legally irrelevant to classification and valuation of a separate portion of that property under state law.  See 3.6.5.8(B) NMAC (2003).  The County's witness -- the mayor of Chama, New Mexico -- had been aware of the various public activities that took place at the Ranch since about 1980, approximately 20 years before Salazar's reclassification.  See Transcript at 47-48.

-17-

**f.    Business Plan**

Smith noted the property's "Business Plan" projected revenues in excess of $1,300,000. See Transcript, Smith Testimony at 36:14-17.  The Nation maintains that the BIA Letter's general statement that total projected revenues for the Chama Ranch in 1997 were $1.3 million does not say anything about land use. See BIA Letter at 10-11.  The Nation contends that the statement could not therefore evidence any land use change that would justify revoking the agricultural land classification for the majority of the Ranch.

**g.    Breakdown of Revenues**

Smith noted the breakdown of revenues to include "all lodge activities such as lodging, $297,000, other activities, $259,875, cattle $38,500, timber $176,000, and game animals $552,700." Transcript, Smith Testimony at 37:1-3.  Again, the Nation contends that the BIA Letter's breakdown of revenues at the Chama Ranch for 1997 does not evidence any land use change that would justify revoking the agricultural land classification for the majority of the Ranch, because BIA did not and could not have characterized such revenue as agricultural versus non-agricultural for purposes for land classification and valuation under the New Mexico Property Tax Code.  Rather, such income characterization is a legal determination that only the County Assessor makes. See NMSA 1978 § § 7-36-2A, 7-36-15B, 7-36-16A; 3.6.5.27(D)(1) NMAC.

**h.    Income**

Smith characterized the income in the BIA Letter from cattle and timber as legitimate agricultural uses at $214,500.00.  He characterized the income from lodging as "recreational or non-agricultural use," and, together with the "other activities" of fishing, skeet shooting, sporting clays, nature walks, horseback riding, and hunting of game animals, that income totaled $1,109,574.  Smith

calculated that over 80% of revenues from the property was "attributable to non-agricultural activities." Transcript, Smith Testimony at 37:6 - 38:15. Smith concluded "the preponderance of the income generated from the property was through non-agricultural sources, and we determined that the primary use of the ranch was as a non-agricultural ranch, but a recreational ranch." Id. at 40:6-9. Again, the Nation contends that the characterization by Salazar's office of various income streams at the Ranch, as noted in the BIA Letter, could not have justified revoking the agricultural land classification for the majority of the Ranch because Salazar had no rational basis for that income characterization other than the legal conclusion that privately owned elk are not livestock. See Decision and Order, Conclusions of Law ¶ 33, at 16; Transcript at 84-85, 117, 122-23 (explaining basis for County's income characterization).

### 8.   <u>Other Ranches</u>

The Nation asserts that the County has been aware since at least 2000 that the Quinlan family raises privately owned elk within a state-licensed game park on a ranch within the County that the County has consistently classified and valued as agricultural land for property tax purposes. See In Re Valuation of Tax Protest No. 2-002-10 Mossman Ranch, Owner No. 008437, Property Code No. 1-028-181-25-250 & In Re Valuation of Tax Protest No. 2-002-11, The Lodge at Chama, Owner No. 002-924, Property Tax Code No. 1-021-171-264-264, Consolidated Hearing Transcript at 157-58 (Rio Arriba County Valuation Protests Board, State of New Mexico, March 19-20, 2003)("Consolidated Hearing Transcript"); New Mexico Department of Game and Fish, Class 'A' Park List; Quinlan Hunting and Recreation, Inc., Trophy Elk Hunts Brochure; Rio Arriba County, Notice of Valuation, Owner No. 1887 (2000, 2001, and 2002). The Nation contends that the Quinlans have been guiding elk hunting for 25 years, including within their game park on their ranch

near Chama.  <u>See</u> Quinlan Trophy Elk Hunts Brochure.  The Nation further contends that numerous other ranches in Rio Arriba County, including the Montaño, Rancho Lobo, and Lazy Triangle Ranches are also used in a similar manner as the Ranch and yet are classified as agricultural for property tax purposes.  <u>See</u> Consolidated Hearing Transcript at 30-31, 133-34, 230-34, 256-60.  In support of this contention, the Nation submitted affidavits signed by the owners of various other ranches in Rio Arriba County all stating that their ranches are taxed as agricultural lands and that the bulk of their income comes from elk hunting.  <u>See</u> Declaration of Wayne E. Quinlan ¶¶ 10, 13, at 3, 4 (executed November 27, 2003); Declaration of James W. Mundy ¶¶ 3, 7, 10, at 1, 2, 3 (executed November 11, 2003); Declaration of Edward R. Spill ¶¶ 3, 8, 11, at 1, 2, 3 (executed October 23, 2000); Declaration of Richard P. Cook ¶¶ 3, 7, 9, at 1, 2 (executed November 5, 2003).

The Defendants assert that the Nation has not provided evidence that these other ranches are used in a similar manner as the Ranch.  The Defendants point out that the transcript that the Nation relies on is from a protest hearing involving the Mossman Ranch in March 2003, and not the transcript of the hearing before the Protests Board regarding the Ranch in December 2000.  Other than the information regarding the Quinlan Ranch, the Nation did not present any of this information to the Protests Board at the December 2000 hearing.  The Nation also did not ask the Defendants to consider the information before or during the December 2000 hearing.

The Defendants contend that the Ranch is not taxed the same way as the Quinlan, Montaño, Rancho Lobo, and Lazy Triangle ranches because, unlike these other ranches, the Ranch provides hunting, outfitting, fishing, a big game lodge and other recreational activities.  <u>See</u> Affidavit of Reynolds J. Smith ¶ 6, at 2 (executed September 25, 2003).  The Nation's web-site and video promotion continually bring to the viewer's attention that the Ranch is a world class facility offering

luxury accommodations and world class cuisine.  See id. ¶ 7, at 2.  The Ranch is a unique facility in New Mexico; none of the other ranches provide the same services or activities that the Ranch provides.  See id. ¶¶ 8-9, at 2.  Although some of the other ranches also have guided elk hunts, they do not offer the extensive hunting, outfitting, fishing, lodging, recreational and big game activities that the Ranch offers.  See id. ¶ 10, at 2.

The Defendants also assert that the Assessor's office must be made aware that there is a problem with the way it has assessed a piece of property -- which is what the BIA Letter did in this case.  See id. ¶ 11, at 2.  The BIA Letter provided notice to the Assessor's office that the Ranch's primary purpose and use was not agricultural.  See id.  The Defendants contend that the Assessor's office has not been made aware of an indicator that the Quinlan, Montaño, Rancho Lobo, and Lazy Triangle ranches have been improperly assessed.  See id. ¶ 13, at 2.  The Defendants point out that the Nation's General Manager's opinion is not a sufficient basis to reclassify the other ranches.

### 9.    The State Case

The Jicarilla Apache Nation appealed the Protests Board's decision to the First Judicial District Court.  The District Court certified the state case to the Court of Appeals of the State of New Mexico as an appeal involving an issue of substantial public interest.  The Court of Appeals reversed and remanded the Protests Board's decision upholding Salazar's reassessment.  The Supreme Court of New Mexico granted a writ of certiorari on July 15, 2003.  See Jicarilla Apache Nation v. Rodarte, 134 N.M. 123, 73 P.3d 826 (2003).  In the interim, the Nation filed this case, stating that the Defendants violated its civil rights.

## PROCEDURAL BACKGROUND

The Nation filed its Complaint alleging that the Defendants violated its civil rights.

-21-

Specifically, the Nation contends that the Defendants violated the Nation's right to equal protection under the Fourteenth Amendment and conspired to violate the Nation's civil rights. Both the Nation and the Defendants filed the motions that are the subject of this opinion pursuant to rule 56(d) of the Federal Rules of Civil Procedure. The Nation's motion is for partial summary judgment on the individual Defendants' lack of entitlement to qualified immunity. Nevertheless, the Nation contends that there are numerous genuine issues of material fact.

The Nation filed a rule 56(f) motion and argues that the Court should stay the Defendants' Motion in part, as it relates to the existence of intentional or purposeful discrimination, and allow discovery on those issues. See Plaintiff's Unopposed Motion to Stay Consideration of Defendants' Motion for Summary Judgment on the Existence of Intentional or Purposeful Discrimination Pending Discovery on that Issue, filed July 14, 2003 (Doc. 31). The Defendants later filed a motion asking the Court to first consider and rule on the portion of its summary judgment motion regarding whether the individual Defendants are entitled to qualified immunity. See Defendants' Motion for the Court to First Determine Whether Defendants are Entitled to Qualified Immunity Prior to the Commencement of Discovery on the Issue of Intentional or Purposeful Discrimination, filed October 24, 2003 (Doc. 47). The Court granted that motion. See Order, filed March 19, 2004 (Doc. 84). Thus, the only issue that the motions raise and which is still before the Court is whether the individual Defendants are entitled to qualified immunity from both of the Nation's claims against them in their individual capacities.

## STANDARD FOR DECIDING MOTION FOR SUMMARY JUDGMENT

Rule 56 allows a court to grant summary judgment if a party is entitled to judgment as a matter of law and there are no genuine issues of material fact. See Celotex Corp. v. Catrett, 477 U.S.

317, 322 (1986).  To avoid summary judgment, the non-moving party must contradict facts that the

movant specifically avers.  See Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888 (1990).  The

court must deny a motion for summary judgment when a genuine issue of material fact remains to be

tried, or where the moving party is not entitled to a judgment as a matter of law.  See Kennedy v.

Silas Mason Co., 334 U.S. 249, 252 (1948).

        The moving party bears the initial burden of establishing the absence of any genuine issue of

material fact.  See Celotex Corp. v. Catrett, 477 U.S. at 323.  The moving party can meet this burden

by "pointing out to the court a lack of evidence as to an essential element of the non-movant's claim.

The burden then shifts to the non-movant to present specific facts, admissible at trial, from which a

rational trier of fact could find for the non-movant."  Bewley v. City of Duncan, 149 F.3d 1190

(table), 1998 WL 314382, *4 (10th Cir. 1998)(citing Fed. R. Civ.  P. 56(c); Celotex Corp. v. Catrett,

477 U.S. at 324).  The non-moving party may not rest on his pleadings but must set forth specific

facts.  See Applied Genetics Int'l v. First Affiliated Secs., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).

"In a response to a motion for summary judgment, a party cannot rest on ignorance of the facts, on

speculation, or on suspicion, and may not escape summary judgment in the mere hope that something

will turn up at trial."  Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988).

        For the purposes of summary judgment, the court will assume the evidence of the non-moving

party to be true, will resolve all doubts against the moving party, construe all evidence in the light

most favorable to the non-moving party, and draw all reasonable inferences in the non-moving party's

favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  If the evidence, interpreted

favorably to the non-moving party, could persuade a reasonable jury to find in favor of the non-

moving party, the court should deny summary judgment.  MacDonald v. Eastern Wyoming Mental

Health Ctr., 941 F.2d 1115, 1121 (10th Cir. 1991). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. at 251-52.

The court should, however, grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. A "genuine" factual dispute requires the non-moving party to show more than a mere scintilla of evidence to overcome a motion for summary judgment. Id. at 252. The court may grant summary judgment if the non-moving party's evidence is merely colorable or is not significantly probative. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 250-51. Under rule 56(e), only statements made with actual knowledge will support a motion for summary judgment; the court must disregard statements of mere belief. See Tavery v. United States, 32 F.3d 1423, 1427 n.4 (10th Cir. 1994)(citations omitted).

## LAW ON QUALIFIED IMMUNITY

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Once a defendant raises the qualified immunity defense, the plaintiff must "come forward with facts or allegations sufficient to show both that the defendant's alleged conduct violated the law and that [the] law was clearly established when the alleged violation occurred." Pueblo Neighborhood Health Centers, Inc. v. Losavio, 847 F.2d 642,

-24-

646 (10th Cir. 1988).  If the plaintiff meets this two-part burden, the defendant "assumes the normal summary judgment burden of establishing that no material facts that would defeat his claim for qualified immunity remain in dispute."  Woodward v. City of Worland, 977 F.2d 1392, 1396-97 (10th Cir. 1992).

The United States Court of Appeals for the Tenth Circuit has set forth the following framework for analyzing the application of the qualified immunity defense to claims brought pursuant to 42 U.S.C. § 1983:

> In analyzing qualified immunity claims, we first ask if a plaintiff has asserted the violation of a constitutional right at all, and then assess whether that right was clearly established at the time of a defendant's actions.  See Siegert v. Gilley, 500 U.S. 226, 232 . . . (1991).  Once a public official raises a qualified immunity defense, the plaintiff bears the burden of (1) coming forward with sufficient facts to show that the defendant's conduct violated the law; and (2) demonstrating that the relevant law was clearly established when the alleged violation occurred.

Pueblo Neighborhood Health Ctrs., Inc. v. Losavio, 847 F.2d 642, 646 (10th Cir. 1988).  See Lawmaster v. Ward, 125 F.3d 1241, 1346-47 (10th Cir. 1997).

If the defendant's conduct, as alleged by the plaintiff, does not violate the law, the court need not reach the issue whether the law was clearly established.  See Hinton v. City of Elwood, Kan., 997 F.2d 774, 782 (10th Cir. 1993).  If, however, the court is persuaded that the defendant's conduct violated the law, "the plaintiff must [also] show the right the defendant's conduct violated was clearly established such that a reasonable person in the defendant's position would have known the conduct violated the right."  Garamone v. Romo, 94 F.3d 1446, 1449 (10th Cir. 1996).  "While the plaintiff need not show that the specific action at issue has previously been held unlawful, the alleged unlawfulness must be 'apparent' in light of preexisting law."  Medina v. City and County of Denver, 960 F.2d 1493, 1497 (10th Cir. 1992).

With respect to the first element, the plaintiff "must articulate the clearly established constitutional right . . . with specificity."  Romero v. Fay, 45 F.3d 1472, 1475 (10th Cir. 1995).  It is insufficient to "identify in the abstract a clearly established right and allege that the defendant has violated it."  Id.  While, generally, the first step in the qualified immunity analysis is whether the plaintiff has established a constitutional violation, the Tenth Circuit has modified that test when subjective intent is one of the essential elements of the constitutional violation alleged.

> This court has set forth a test for examining the issue of intent in the context of a summary judgment motion based on qualified immunity.  First, Defendants must make a prima facie showing of the objective reasonableness of the challenged conduct.  If Defendants meet their burden of showing objective reasonableness, we next consider whether the [Plaintiff] satisfied the burden of presenting evidence Defendants acted on the basis of a culpable subjective state of mind.[3]

McCook v. Springer School District, 44 Fed. Appx. 896, 905 (10th Cir. 2002).

The "clearly established" requirement ordinarily means that there must be a Supreme Court or Tenth Circuit opinion on point, or that the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.  Furthermore, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Garamone v. Romo, 94 F.3d at 1451 (internal quotation marks and citation omitted).

---

[3] In Gehl Group v. Koby, 63 F.3d 1528 (10th Cir. 1995), the Tenth Circuit indicated that once the defendant meets its burden, "the Plaintiff's burden to establish subjective motivating animus becomes heightened, requiring specific and concrete evidence rather than mere speculation.  Id. at 1535.  In Patel v. Wooten, 15 Fed. Appx. 647 (10th Cir. 2001), the Tenth Circuit overruled the heightened pleading requirement.  See McCook v. Springer School District, 44 Fed. Appx. at 906 n.5 (recognizing overruling).  Although the Tenth Circuit has overruled the heightened pleading requirement, a plaintiff must still meet the general summary judgment standards in order to overcome a defendant's motion for summary judgment on the basis of qualified immunity.  That is, a plaintiff must do more than rest on its own speculation or pleadings.  See Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)("In a response to a motion for summary judgment, a party cannot rest on ignorance of the facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial.").

If the plaintiff fails to make the twofold showing, the defendant prevails.  See Hannula v. City of Lakewood, 907 F.2d 129, 131 (10th Cir. 1990).  If the plaintiff succeeds, the burden shifts to the defendant to make the usual summary judgment showing that there are no genuine issues of material fact, and that he or she is entitled to judgment as a matter of law.  See Cummins v. Campbell, 44 F.3d 847, 850 (10th Cir. 1994).

## LAW GOVERNING EQUAL PROTECTION CLAIM

The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws."   United States Constitution, amend. XIV.  This amendment is triggered when the government treats someone differently than another who is similarly situated.  There are three categories of equal protection violations: (i) one involves charges of singling out members of a vulnerable group, racial, or otherwise, for unequal treatment; (ii) another involves challenges to laws or policies alleged to make irrational distinctions; and (iii) the third involves a situation where the government exerts its power over an individual because of an animosity toward that individual.  See Garcia v. State of New Mexico Office of the Treasurer, 959 F. Supp. 1426, 1432 (D.N.M. 1997)(Hansen, J.).

Before, however, someone can have an equal protection claim based on any of the three categories, that person must show that there is an element of intentional or purposeful discrimination. See id.  The existence of intentional or purposeful discrimination constitutes an element of both of the Nation's claims.  See, e.g., Dixon v. City of Lawton, Okla., 898 F.2d 1443, 1449 & n. 6 (10th Cir. 1990)(conspiracy); Cook v. City of Price, 566 F.2d 699, 701 (10th Cir. 1977)(equal protection).

The Supreme Court of the United States has recognized that the Equal Protection Clause of the Fourteenth Amendment applies to claims brought by a "class of one," where the plaintiff alleges

that he or she "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." <u>Village of Willowbrook v. Olech</u>, 528 U.S. 562, 564 (2000)(per curiam).  The Tenth Circuit has indicated that a plaintiff making a class of one equal protection claim must do more than merely assert that a defendant treated it differently from others who are similarly situated.  See <u>Yalowizer v. Town of Ranchester, Wyoming</u>, 18 Fed. Appx. 745, (10th Cir. September 5, 2001)(unpublished)("Plaintiffs may have been similarly situated to others in town who operated home businesses, but they have not demonstrated that they were treated differently enough to state a constitutional violation.").  Such a plaintiff must establish a question of fact as to two elements to survive a summary judgment with regard to a class of one equal protection claim.  First, the element of intent.  See <u>Bartell v. Aurora Public Schools</u>, 263 F.3d 1143, 1148 (10th Cir. 2001)("[The plaintiff] must show that 'the action taken by the state, whether in the form of prosecution or otherwise, was a spiteful effort to get [Bartell] for reasons wholly unrelated to any legitimate state objective.'")(quoting <u>Esmail v. Macrane</u>, 53 F.3d 176, 180 (7th Cir. 1995)).  Second, "[a]s with any equal protection claim, Bartell must also demonstrate that he was treated differently than another who is similarly situated."  <u>Bartell v. Aurora Public Schools</u>, 263 F.3d at 1148 (internal quotation marks and citation omitted).  As is revealed in the Tenth Circuit's language, the standard of review that the Court must use in determining whether a plaintiff has established a class of one equal protection claim is a rational basis review, or whether the Defendants' actions were "wholly unrelated" to a legitimate state objective.  <u>Id.</u>

Other courts have upheld "class of one" cases "in which a governmental body treated individuals differently who were identically situated in all respects rationally related to the government's mission."  <u>Indiana State Teachers Ass'n v. Board of School Comm'rs of the City of</u>

Indianapolis, 101 F.3d 1179, 1181 (7th Cir. 1996)(citing Rubinovitz v. Rogato, 60 F.3d 906, 911-12 (1st Cir. 1995); Zeigler v. Jackson, 638 F.2d 776, 779 (5th Cir. 1981); LeClair v. Saunders, 627 F.2d 606, 609-10 (2d Cir. 1980)).   "While the principal target of the equal protection clause is discrimination against members of vulnerable groups, the clause protects class-of-one plaintiffs victimized by 'the wholly arbitrary act.'"   Indiana State Teachers Ass'n v. Board of School Comm'rs of the City of Indianapolis, 101 F.3d at 1181 (quoting City of New Orleans v. Dukes, 427 U.S. 297, 304 (1976)(per curiam)).

Where the underlying conduct upon which the claim is premised does not independently rise to the level of a constitutional violation, the Court must scrutinize the claim of malignant animosity especially stringently.  See Indiana State Teachers Assn. v. Board of School Comm'rs of the City of Indianapolis, 101 F.3d at 1181 ("The review of . . . a decision not claimed to violate some other source of constitutional obligation such as the free-speech clause of the First Amendment is not the proper business of the federal judiciary" and "the concept of equal protection is trivialized when it is used to subject every decision made by state or local government to constitutional review by federal courts."); Esmail v. Macrane, 53 F.3d at 179 (recognizing that this category of claim is "no doubt subject to abuse by persons whose real complaint is selective prosecution in the sense that is not cognizable in suits to enforce the equal protection clause."); Yerardi's Moody St. Restaurant & Lounge, Inc. v. Board of Selectmen, 932 F.2d 89, 94 (1st Cir. 1991); Le Clair v. Saunders, 627 F.2d 606, 611 (2d Cir. 1980).

## LAW ON CONSPIRACY

In Dixon v. City of Lawton, Oklahoma, 898 F.2d 1443 (10th Cir. 1990), the Tenth Circuit recognized that, to recover under a § 1983 conspiracy theory, a plaintiff must plead and prove not

only a conspiracy, but also an actual deprivation of rights; pleading and proof of one without the

other is insufficient.  See Kaplan v. Clear Lake City Water Auth., 794 F.2d 1059, 1065 (5th Cir.

1986); Farrar v. Cain, 756 F.2d 1148, 1151 (5th Cir. 1985); Dooley v. Reiss, 736 F.2d 1392, 1395

(9th Cir.), cert. denied, 469 U.S. 1038 (1984); Landrigan v. City of Warwick, 628 F.2d 736, 742-43

(1st Cir. 1980); Hampton v. Hanrahan, 600 F.2d 600, 622-23 (7th Cir. 1979), rev'd in part on other

grounds, 446 U.S. 754 (1980).  The essence of a § 1983 claim is the deprivation of the right rather

than the conspiracy.  See Lesser v. Braniff Airways, Inc., 518 F.2d 538, 540 n. 2 (7th Cir. 1975).

"Conclusory allegations of conspiracy are insufficient to state a valid § 1983 claim."  Tonkovich v.

Kansas Bd. of Regents, 159 F.3d 504, 533 (10th Cir. 1998).

## ANALYSIS

The Nation urges the Court to deny the Defendants' motion because there are numerous

issues of fact.  In particular, the Nation contends that the Defendants have acted in concert in an

arbitrary, objectively unreasonable manner in revaluing the Nation's land for property tax purposes

without any adequate basis in law or fact, and that they have treated the Nation's land in a manner

different from similarly situated properties.  The Nation contends that the New Mexico Court of

Appeals has rejected the Defendants' primary asserted bases for revaluing the Nation's Chama Ranch

as arbitrary, unreasonable, and erroneous.

The Court has agreed with the parties that it is appropriate to first determine whether the

individual Defendants are entitled to qualified immunity from the Nation's claims before proceeding

to determine the merits of the Nation's claims.  See Order, filed March 19, 2004 (Doc. 84)(granting

the Defendants' Motion for the Court to First Determine Whether Defendants Are Entitled to

Qualified Immunity Prior to the Commencement of Discovery on the Issue of Intentional or

Purposeful Discrimination, filed October 24, 2003 (Doc. 47)).  The Nation filed its own partial summary judgment motion regarding qualified immunity.  It thus appears that the parties agree that the Court may appropriately rule on the qualified immunity issue with regard to the undisputed facts in the record at this juncture.

I.   **THE NATION'S RULE 56(f) MOTION DOES NOT PRECLUDE THE COURT FROM RULING ON THE MOTION FOR SUMMARY JUDGMENT.**

In the Nation's response in opposition to the Defendants' motion for summary judgment, as well as in a separate motion, the Nation argues that they are entitled to additional discovery under rule 56(f) of the Federal Rules of Civil Procedure.  Rule 56(f) provides that:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed. R. Civ. P. 56(f).  "The general principle of Rule 56(f) is that 'summary judgment [should] be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition.'"  Price v. Western Resources, Inc., 232 F.3d 779, 783 (10th Cir. 2000)(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 250 n. 5).

Although the Nation cites several cases in support of their request for additional discovery, they do not cite any authority for the proposition that rule 56(f) negates the protection that qualified immunity affords government officials.  The Supreme Court has instructed district courts to be mindful that qualified immunity protects government officials from discovery.  See Harlow v. Fitzgerald, 457 U.S. at 817-18 ("[W]e conclude today that bare allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching

discovery . . . .   Until this threshold immunity question is resolved, discovery should not be allowed.").

Thus, the doctrine of qualified immunity requires courts to analyze requests for additional discovery somewhat differently than other cases.

> A district court has discretion to determine whether to allow additional discovery following the filing of a Rule 56(f) affidavit and the Rule 56(f) affidavit "should be treated liberally unless dilatory or lacking in merit."  Patty Precision v. Brown & Sharpe Mfg. Co., 742 F.2d 1260, 1264 (10th Cir.1984).  However, the district court's discretion is not without bounds, particularly when the summary judgment motion is grounded on a claim of qualified immunity:
>
>> Rule 56(f) discretion must be limited when a summary judgment motion is based on qualified immunity because insubstantial lawsuits "against government officials [should] be resolved prior to discovery and on summary judgment if possible."  Anderson v. Creighton, 483 U.S. 635, 640 n. 2 (1987) . . . .   Liberal application of rule 56(f) should not be allowed to subvert the goals of Harlow and its progeny.
>
> Jones v. City and County of Denver, Colo., 854 F.2d 1206, 1211 (10th Cir.1988).

Lewis v. City of Ft. Collins, 903 F.2d 752, 758 (10th Cir. 1990).   "Rule 56(f) is not a license for a fishing expedition, especially when summary judgment is urged based on a claim of qualified immunity."  Id. at 759.  In response to a summary judgment motion based on qualified immunity, a plaintiff's rule 56(f) affidavit must demonstrate "'how discovery will enable them to rebut a defendant's showing of objective reasonableness' or, stated alternatively, demonstrate a 'connection between the information he would seek in discovery and the validity of the [defendant's] qualified immunity assertion.'"  Id. at 758 (quoting Jones v. City and County of Denver, Colo., 854 F.2d at 1211).  "[I]t is insufficient for the party opposing the motion to merely assert that additional discovery is required to demonstrate a factual dispute or that evidence supporting a party's allegation is in the opposing party's hands."  Lewis v. City of Ft. Collins, 903 F.2d at 758 (internal quotation marks and

citation omitted).

The Court does not believe that the Nation has made such a showing. The Nation's rule 56(f) motion indicates that the Nation requests discovery on "the existence of intentional or purposeful discrimination against the Nation" to dispute the Defendants' summary judgment motion. Specifically, the Nation identifies three facts that it would like to pursue discovery on: (i) that the Defendants indicated a desire in 1996 to increase the Nation's taxes on the Ranch in a letter from Valdez to the Department of the Interior opposing the Department's acquisition of the Nation's land in trust and later in a 2000 letter from Candelaria to Valdez; (ii) that Candelaria testified that he attended a seminar regarding the classification of elk, which the Nation asserts conflicts with independently obtained evidence; (iii) that the Defendants treated the Ranch differently from other similarly situated properties. See Declaration of Daniel I.S.J. Rey-Bear ¶¶ 9-12, at 2-4 (executed July 14, 2003).

With regard to the Valdez and Candelaria letters, the Court first notes that the Nation concedes the basis described in the letters for wanting to increase the property taxes was the sale price that the Nation paid for the Ranch. Before the Nation bought the land in question, it had been valued at $6 million. See Letter from Valdez to the Department of Interior ¶ 1, at 1 (June 14, 1996). The Nation paid $25 million to purchase the land. See id. Valdez stated that, based on the purchase price, "the new tax assessment would have increased significantly." Id. Candelaria's 2000 letter indicates the same information. See Letter from Candelaria to Valdez at 1 (February 28, 2000). The Nation does not provide the Court with any evidence or argument to suggest why these letters indicate a discriminatory intent. It appears reasonable to the Court that a possible increase of $19 million in the value of property may suggest that the property should be re-assessed for tax purposes.

Because the Nation has not explained how pursuing discovery based on these two letters would establish that the Defendants acted unreasonably or with discriminatory intent, the Court will deny the rule 56(f) motion on this basis.

Next, the Nation asserts that it has conflicting evidence regarding Candelaria's attendance at a "certain seminar." Rey-Bear Decl. ¶ 11, at 4. The Nation does not, however, indicate what that conflicting evidence is or why it suggests a possible discriminatory motive. Candelaria testified that he attended a seminar at which he learned that the County had been mistakenly assessing the Nation's elk herd. See Transcript, Candelaria Testimony 76-77, 91-92. This seminar prompted the Defendants to reassess the elk herd that the Nation owns. Without an indication of what conflicting evidence the Nation has regarding Candelaria's testimony, the Court cannot conclude that the Nation has shown that pursuing discovery on this issue will lead to evidence of a discriminatory motive.

Finally, the Nation argues that the Defendants did not treat similarly situated property as it treated the Ranch and, thus, pursuing discovery as to the treatment of other ranches will lead to evidence of discriminatory motive. Importantly, the evidence which would establish that the other ranches are, in fact, similarly situated is not evidence that the Defendants would necessarily possess. Rather, the Nation could procure such evidence from the owners of such ranches. The Nation did obtain affidavits from these owners, but, as the Court concludes below, those affidavits do not establish that the ranches are similarly situated. Presumably the only discovery that the Defendants would have on this issue would be evidence of how the Defendants have treated these other ranches for property tax purposes -- the issue for which the Nation has already obtained affidavits from the ranch owners. Again, the Court can not conclude from the information the Nation provided in its rule 56(f) affidavit that pursuing discovery on this issue will lead to evidence of a discriminatory motive.

While the Nation has presented an argument that further discovery might assist in establishing that the Defendants made an erroneous decision or one contrary to state law, the Nation has not presented the Court with a basis to find that discovery would produce evidence of the Defendants' discriminatory intent, and thus would establish a constitutional violation. Further, the Nation has twice agreed to delay discovery. First, at the outset of the case, the parties agreed that the potential affirmative defenses counseled a delay in exchanging initial disclosures. See Provisional Discovery Plan ¶ 2, at 1, filed January 27, 2003 (Doc. 9)("The parties agree that initial disclosures are not appropriate at this time in the circumstances of this case..."). The Court subsequently entered such a stay of discovery. See Order Setting Briefing Schedule for Motion to Dismiss and Revised Discovery Schedule, filed March 3, 2003 (Doc. 17). Second, following the Court's March 30, 2004 ruling on the Defendants' first summary judgment motion and the Nation's motion for partial summary judgment, see Order, filed March 30, 2004 (Doc. 85), Amended Order, filed March 31, 2004 (Doc. 86), the parties agreed to, and the Court ordered, a stay of discovery pending adjudication of a second dispositive motion that the Defendants intended to file, and set a briefing schedule for that second motion for summary judgment. See Joint Motion to Set Briefing Schedule for Dispositive Motion and Revised Discovery Schedule, filed April 7, 2004 (Doc. 90); Order Setting Briefing Schedule for Dispositive Motion and Revised Discovery Schedule, file April 9, 2004 (Doc. 91).

Finally, the Court notes that the Nation has been involved in state court litigation against these same parties for several years, including the process before the Protests Board in which the Board heard testimony from some of the Defendants. The Nation does not point to any of the information learned in these other forums to suggest its assertion that evidence of a discriminatory animus exists

is well founded.  The Court, therefore, need not allow the Nation further discovery before ruling on the Defendants' entitlement to qualified immunity.

II.     **THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY BECAUSE THE RECORD DOES NOT ESTABLISH A CONSTITUTIONAL VIOLATION.**

The constitutional violation that the Nation alleges is a violation of the Equal Protection clause of the Fourteenth Amendment under the "class of one" theory.  As explained above, the Nation must establish two elements in order to show such a violation: (i) that the Defendants acted with discriminatory intent and (ii) that the Defendants treated the Nation differently from others who were similarly situated without a rational basis for doing so.

A.     **THE NATION HAS NOT ESTABLISHED THAT THE DEFENDANTS ACTED WITH A DISCRIMINATORY INTENT.**

Because this first element of the constitutional violation that the Nation alleges involves subjective intent, the Court will use the modified qualified immunity test that the Tenth Circuit has articulated for analyzing subjective intent elements on a summary judgment motion based on qualified immunity.  See McCook v. Springer School District, 44 Fed. Appx. 896, 905 (10th Cir. 2002).  Thus, the Court will first look to whether the Defendants have met their burden of establishing the objective reasonableness of their conduct and then consider whether the plaintiffs have rebutted that showing by presenting evidence of a discriminatory animus which motivated the Defendants' actions.

1.     **The Defendants Have Met Their Burden of Establishing the Objective Reasonableness of Their Actions in Re-Classifying the Ranch.**

While the Nation was entitled, under § 7-36-20(A), to a statutory presumption of entitlement to the special method of valuation, the undisputed fact is that Salazar put forth considerable evidence

to rebut that presumption.  While the Nation may disagree with the extent to which Salazar actually relied on such evidence, they do not dispute that Salazar had the evidence on which he says that he relied.

The Protests Board found that the Defendants met the standard in 3.6.5.27(A)(6) NMAC and rebutted the presumption in the property owner's favor.  As noted above, the relevant standard for 3.6.5.27(A)(6) NMAC is a "substantial evidence" standard.  See Duke City Lumber Co. v. New Mexico Environmental Improvement Board, 101 N.M. 291, 293, 681 P.2d 717, 719 (1984). "Substantial evidence" is evidence that a reasonable mind would regard as "adequate" to support a conclusion.  Fitzhugh v. New Mexico Dept. of Labor, 122 N.M. 173, 180, 922 P.2d 555, 562 (1996).

The testimony establishes that Salazar first learned about new business plans, goals, and income information for the property from the October 28, 1999 BIA Letter, which Salazar's staff received and reviewed in November or December, 1999.  See Transcript at 27-30.  Salazar testified that he considered the BIA Letter to present reliable information, because its source is a federal government agency, reporting on behalf of the property owner.  See id.  The BIA developed its letter while addressing the taxpayer's application for trust status of the property.  See BIA Letter.

The Court can reasonably construe -- as did the Protests Board -- the BIA Letter as a voluntary report from the governmental agency on behalf of the property owner to Salazar of a change in primary use of the property from agricultural to non-agricultural, as the BIA sent the letter directly to Rio Arriba County.  Pursuant to 3.6.5.27(A)(5) NMAC, a voluntary report on behalf of the property owner negates the presumption of § 7-36-20(A) for a continuing classification of the property as an agricultural property.  Although the Protests Board found and concluded that the BIA Letter is a voluntary report on behalf of the property owner, Salazar proceeded on the basis of

-37-

3.6.5.27(A)(6) NMAC, which states: "When the owner of the land has not reported that the use of the land is no longer primarily for agricultural purposes but the county assessor has evidence sufficient to rebut the presumptions in Subsection A of Section 7-36-20 NMSA 1978, the county assessor must change the classification of the land."  Thus, under 3.6.5.27(A)(6) NMAC, Salazar relied on the BIA Letter as evidence that was sufficient to rebut the presumptions in § 7-36-20(A), regardless whether the letter amounted to a voluntary report on behalf of the property owner.

Salazar discovered Internet web-sites advertising the subject property as "one of the world's foremost outdoor recreational retreats," "internationally renowned hunts," "fine dining and cuisine every meal of the day," and with other attractive outdoor recreational activities.[4]  The web-sites lent further support to Salazar's finding that the primary use of the subject property was non-agricultural

_____

[4] The parties dispute whether Salazar had this evidence before the reclassification.  The Nation contends that this constitutes evidence supporting a "post hoc rationale" for Salazar's reclassification, rather than evidence that Salazar actually relied on.  The Nation further asserts that the Court may not consider such "post hoc rationales" in determining whether the Defendants' actions were reasonable.  The Tenth Circuit has not explicitly clarified the breadth of what the Court may consider in determining the objective reasonableness of the Defendants' actions when the Defendants' subjective intent is an element of the constitutional violation alleged.  The Tenth Circuit has, however, generally confined its objective reasonableness analysis in this area to only  those facts and circumstances which the Defendants knew at the time of the disputed decision.  See, e.g., Lackey v. County of Bernalillo, 1999 WL 2461 at *4 (analyzing the facts that the Defendant knew at the time of his decision); Lewis v. City of Ft. Collins, 903 F.2d at 755-58 (same).

Taking the facts in the light most favorable to the Nation, and assuming that Salazar had not seen the web-sites at the time he reclassified the property, the Court need not consider whether the web-sites provide a basis for finding the reassessment objectively reasonable at the time Salazar reclassified the property.  This does not, however, change the Court's determination  that the Defendants acted in an objectively reasonable manner.  Salazar did not represent that the web-sites provided the sole basis or justification for his actions, merely that they confirmed his actions, which he took in reliance on the information he learned in the BIA Letter.  Additionally, taking the facts in the light most favorable to the Nation, Salazar saw the web-sites during the protest period but after the reclassification.  Thus, the web-sites provided the Defendants with further evidence to defend their actions to the Protests Board, and provided the Protests Board with further support for affirming Salazar's reclassification.

in nature.  During the protest period, Salazar also obtained a promotional video of the property, which touted the various recreational activities available for its paying guests.

Ron Smith testified in detail about his reading and understanding of the BIA Letter and its significance in leading to the change in classification from agricultural to miscellaneous.  Based on the BIA Letter, it was objectively reasonable for the Defendants to conclude that the Nation's primary use of its property is for non-agricultural purposes.  In its letter, the BIA indicated the Nation's intent, purpose, and plan for the property.  BIA Letter at 3, 10-11 ((i) "5. The purposes for which the land will be used"; (ii) "12. Business plan.").  The business plan emphasizes recreational-for-profit uses over agricultural uses of the property.  The BIA Letter contained numerous references to the plans, purposes, and goals for the property's acquisition, including a change in name signaling a possible change in the focus or purpose; that "primarily" the property would be used to provide additional land, lodging, and facilities for expansion of the "Tribe's renowned big game hunting operation"; that the Lodge was currently charging $200.00 per person per night and the recreational activities of hunting, fishing, equestrian, and sporting clays were charged extra at $175.00 per person per day; and that the owner's business plan called for a "multi-resource land management enterprise" involving lodging accommodations, conference facilities, hunting and fishing services, and timber, agricultural and livestock divisions.

The BIA Letter then analyzed 1997 income, where income from the combined non-agricultural uses greatly exceeded income from the combined agricultural uses.  Similarly, there was evidence throughout its actual operations, including  its advertising and pricing strategies, of the property owner's intent to make recreational and other non-agricultural uses of the property "primary."  There was also evidence that a high demand for recreational uses drove these strategies.

There is evidence that Salazar based his determination of reassessment on substantial evidence and conformed with the law. The Protests Board held that Salazar properly relied upon a reasonable interpretation of the applicable statutes, regulations, and case law. "Unless a method or methods of valuation are authorized in Sections 7-36-20 through 7-36-33 NMSA 1978, the value of property for taxation purposes shall be its market value." NMSA 1978, § 7-36-15(B). In this case, Salazar had an objectively reasonable basis to use the income information from the property in his determination that the primary use of the property did not qualify for the special method of valuation for land use under NMSA 1978, § 7-36-020.

The Nation contends that Salazar's determination that various land uses at the Chama Ranch were non-agricultural presents a legal conclusion that the New Mexico Court of Appeals implicitly rejected when it reversed Salazar classification of the majority of the Chama Ranch. See Jicarilla Apache Nation v. Rio Arriba County Assessor, 2004-NMCA-055, ¶ 42, 92 P.3d at 653. As noted above, however, the question presented to this Court is not whether Salazar's determination was accurate or correct under the state law, but whether all of the Defendants' actions regarding the reassessment were objectively reasonable. This Court is concerned with whether the Nation has presented evidence of a federal constitutional violation, not whether the Defendants made the appropriate decision under state law. See, e.g., Gonzales v. City of Castle Rock, 366 F.3d 1093, 1100 n.4 (10th Cir. 2004)("We certainly concur with the common refrain in these cases that the mere violation of state law does not automatically give rise to a constitutional due process violation, and that the due process clause should not be so stretched that it becomes 'a font of tort law to be superimposed upon whatever systems may already be administered by the States.'")(citing Daniels v. Williams, 474 U.S. 327, 332 (1986)(quoting Paul v. Davis, 424 U.S. 693, 701 (1976))).

The regulations promulgated pursuant to the property tax code provide support for Salazar's interpretation.  See 3.6.5.27(A)(2) NMAC ("A presumption exists that land is not used primarily for agricultural purposes if income from non-agricultural use of the land exceeds the income from agricultural use of the land.").  The Court of Appeals in Black v. Bernalillo County Valuation Protests Board, 95 N.M. 136, 141, 619 P.2d 581, 586 (Ct. App. 1980), questioned in dictum the property tax division's authority to create this presumption by regulation; nevertheless, the Court of Appeals recognized that the income information is proper evidence to consider in determining the proper classification of agricultural property.  See id. at 139, 619 P.2d at 584.

It was objectively reasonable for Salazar, in reliance on the statute and regulations, to use income information in his reasons to change the classification of the property.  It was also objectively reasonable for the Protests Board to conclude that this income information met and exceeded the "sufficient evidence" standard of 3.6.5.27(A)(6) NMAC.  In Black v. Bernalillo County Valuation Protests Board, there was no income from a non-agricultural use of the land to justify a change in the agricultural classification.  In this case, the Protests Board found that there was a significant and recurring excess of non-agricultural income over agricultural income from the multiple uses of the land, which justified the change in classification from agricultural to miscellaneous.  See Decision and Order, Conclusions of Law ¶ 27, at 15.  The New Mexico Court of Appeals in Alexander v. Anderson, 1999-NMCA-021, 973 P.2d 884, pointed to its use of income information in Black v. Bernalillo County Valuation Protests Board.  See Alexander v. Anderson, 1999-NMCA-021, ¶ 26, 973 P.2d at 892 (noting that the taxpayer in Black earned "no income from any source other than agriculture.")(internal quotation marks and citation omitted).  Following Black and Alexander, the Protests Board found that Salazar properly employed income information in his classification of the

-41-

property.  See Decision and Order, Conclusions of Law ¶¶ 14, 15, 16, at 13.

The factual evidence in the record establishes that the Protests Board believed the Defendants met their burden before the Protests Board to rebut the statutory presumption in the Nation's favor regarding the special valuation.  The Nation does not sue the Protests Board.  Thus, the fact that the Protests Board -- an separate entity -- agreed with the Defendants provides support for a finding of objective reasonableness.  The Court, therefore, finds that the Defendants' actions with regard to the reassessment of the Ranch for property tax purposes were objectively reasonable.

### 2.    The Nation Has Not Met Its Burden of Submitting Evidence to Establish that the Defendants Acted with Discriminatory Intent.

The burden, therefore, shifts to the Nation to offer evidence that the Defendants "acted on the basis of a culpable subjective state of mind."  McCook v. Springer School District, 44 Fed. Appx. at 905.  The Nation has not provided the Court with evidence showing that the Defendants acted with a culpable state of mind.

The Nation has made several arguments that the Court can infer discriminatory intent based on the record before it.  First, the Nation submitted numerous newspaper articles detailing the investigation that the Department of Game and Fish conducted into whether the Nation was involved in the illegal trapping of wild elk.  Thus, as the Nation argues, the Defendants must have been aware well before the re-classification that the Nation owned elk and offered elk hunting at the Ranch.  As noted above, the elk herds were not the only reason that the Defendants reclassified the land in question; the BIA Letter provided a number of facts in support of a finding that the Nation's primary use of the land was non-agricultural.  Further, this evidence does not point to discriminatory intent as a motive for the Defendants' reassessment of the land.

Second, the Nation points to the New Mexico Court of Appeals opinion reversing the Protests Board's decision as evidence that the Defendants made the wrong decision in reassessing the Ranch and thus, the Nation argues, the Defendants must have based the decision on a discriminatory motive. Such a conclusion does not necessarily follow.  As the Court noted above, the concern in this matter is whether the Nation has established constitutional violation -- not whether the Defendants got it wrong.  While the New Mexico Court of Appeals did state "we see no reasonable basis for considering the herd to be anything other than livestock for purposes of the Code," Jicarilla Apache Nation v. Rio Arriba County Assessor, No. 22,336, 2004-NMCA-055, ¶ 33, 92 P.3d 642, 651, it did not indicate that the entirety of the Defendants' rationale for their decision was unreasonable.  Rather, the court indicated that the Defendants based their determination on "an erroneous interpretation of the law."  Id. ¶ 42, 92 P.3d at 653.  Further, the court initially found that the issue before it was a case of first impression and one of "substantial public interest."  Id. ¶¶ 11-13, 92 P.3d at 645-46. Thus, even though the New Mexico Court of Appeals disagreed with the Protests Board's (and thus the Defendants') interpretation of the law, the issue was not so clear based on the law at hand that the Court can conclude the Defendants' actions were the result of a discriminatory animus.

The Nation has not offered evidence that the Defendants acted with an impermissible discriminatory motive, but rather disputes the decisions the Defendants made with regard to the Ranch.  These disputes do not establish that the Defendants acted with an impermissible motive. Thus, the Nation has not met its burden in the qualified immunity analysis that the Court applies when subjective intent is an essential element of the constitutional violation at issue.  It follows that the Nation has not met the first element of the test for a class of one equal protection claim -- intentional or purposeful discrimination -- and, therefore, cannot establish a constitutional violation to overcome

-43-

the individual Defendants' assertion of qualified immunity.

**B.    THE RECORD DOES NOT ESTABLISH A QUESTION OF FACT WHETHER THE DEFENDANTS TREATED THE RANCH DIFFERENTLY THAN SIMILARLY SITUATED RANCHES.**

Even if the Court were to find that a question of fact exists as to the intent element -- or that it should not decide that element at this stage given that the Nation has not conducted discovery into the question of intent -- the Court does not believe the Nation has established that the Defendants treated it differently than others who were similarly situated, the second element of a class of one equal protection claim.

**1.    The Nation Has Not Established that the Other Ranches Are Sufficiently Similarly Situated.**

The Nation presented evidence that there are other ranches in Rio Arriba County, that those ranches earn the majority or all of their income from elk hunting, and that the county has consistently assessed those ranches as agricultural land.  Importantly, however, the Nation did not offer evidence that these other ranches are sufficiently similarly situated to be useful in an equal protection analysis.

From the affidavits that the other ranch owners submitted, it does not appear that these ranches are sufficiently similar.  First, it does not appear that the other ranches offer lodging; rather the affidavits establish that the hunters who come to these other ranches generally stay at hotels in town.  Second, the affidavits do not establish that the other ranches offer the breadth of activities that the Ranch offers.  As noted above, the Defendants' determination that the Ranch should be reassessed did not rest solely on the fact that elk hunting occurred on the property.  Rather, the BIA Letter detailed a number of non-agricultural activities that the Defendants considered.  The record does not contain evidence -- and the Nation does not argue -- that these other ranches all included similar

-44-

activities in addition elk hunting. Finally, the Nation has not presented evidence that the Defendants were apprised at any time of a defect in the assessments of the other ranches and that the Defendants then made a determination to treat the Ranch differently. In other words, the Defendants have not received information like that contained in the BIA Letter about any of the other ranches that would prompt a reassessment.

The Tenth Circuit has been clear that a plaintiff must show differential treatment to maintain an equal protection claim. See Bartell v. Aurora Public Schools, 263 F.3d at 1148 ("As with any equal protection claim, Bartell must also demonstrate that he was treated differently than another who is similarly situated.")(internal quotation marks and citation omitted). The record does not establish a genuine issue of material fact whether the Defendants treated the Nation differently from others who were similarly situated.

> **2.      The Nation has Not Established a Genuine Issue of Fact Whether the Defendants Actions Were Wholly Unrelated to a Legitimate State Purpose.**

Even if there were evidence in the record creating a question whether the Defendants acted with discriminatory intent and treated the Nation differently from others who were similarly situated, the Court would only find a constitutional violation where the Defendants actions were wholly unrelated to a legitimate state purpose. Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)(per curiam)(holding that a plaintiff in a class of one equal protection claim case must establish that it "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.")(emphasis added). In this case, the Defendants acted to reassess the Nation's property when it came to their attention that the property, which had been assessed as agricultural, was being used mostly for non-agricultural purposes. "Proper enforcement

of property tax laws is a legitimate local governmental interest[.]"  Church of Scientology Flag Service Org., Inc. v. City of Clearwater, 2 F.3d 1514, 1531 (11th Cir. 1993).

As noted above, the Defendants acted objectively reasonably -- that is, the Defendants acted with objectively reasonable reliance on the information in front of them to determine that the Ranch should be reassessed largely as non-agricultural land.  The Defendants made this determination based on the property tax laws of the state of New Mexico.  While the New Mexico Court of Appeals has determined that the reassessment was wrong, reversing the Protests Board decision, the Court of Appeals decision is on appeal to the New Mexico Supreme Court, which has not yet spoken on this case.  Further, the state district court certified the question to the New Mexico Court of Appeals on the basis that it involved an issue of substantial public interest.  As noted above, the New Mexico Court of Appeals agreed that the issue before it -- the correctness of the Protests Boards' affirmance of the reassessment -- was both a matter of first impression and one of substantial public interest.  Thus, the Defendants were acting in the absence of clear direction from the courts as to the proper interpretation of the state tax provisions in question.  On these facts, the Court believes the Defendants' actions were rationally related to a legitimate state purpose -- the proper application of New Mexico tax law.  The Nation has not, therefore, established a constitutional violation and the individual Defendants are, thus, entitled to qualified immunity from the Nation's Equal Protection claims.[5]

_____

[5] The Nation has not presented evidence to support its conspiracy claim.  Given the undisputed facts, the Nation also does not have a conspiracy claim against the individual Defendants. In addition to proving an agreement, the Nation must prove an actual deprivation of a right "secured by the Constitution and laws."  42 U.S.C. § 1983.  See Earle v. Benoit, 850 F.2d 836, 845 (1st Cir. 1988); Villanueva v. McInnis, 723 F.2d 414, 418-19 (5th Cir. 1984).  The Nation does not point to evidence of an agreement in the record.  Further, the Court has found that the Nation has not established an actual deprivation of a constitutional right.  The record contains only conclusory

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Daniel I.S.J. Rey-Bear
Jennifer J. Dumas
Nordhaus Haltom Taylor Taradash & Bladh, LLP
Albuquerque, New Mexico

  *Attorneys for the Plaintiff*

R. Galen Reimer
Harriet Hickman
Gallagher, Casados & Mann, P.C.
Albuquerque, New Mexico

  *Attorneys for the Defendants*

---

allegations of conspiracy, which are insufficient to support a claim of a constitutional violation. See
Eden v. Voss, No. 03-2030, 2004 WL 1535829 (10th Cir. July 9, 2004)("[R]ead liberally, the
complaint here states only conclusory allegations of conspiracy, which are insufficient to state a claim
for relief."); Tonkovich v. Kansas Bd. of Regents, 159 F.3d 504, 533 (10th Cir. 1998). The Court
will grant summary judgment with regard to the conspiracy claims against the individual Defendants
in their individual capacities.

   The Court notes that, while the Complaint identifies 42 U.S.C. § 1985 as the basis for the
Nation's conspiracy claims, the parties referred only to 42 U.S.C. § 1983 as the basis for all of the
Nation's claims in the briefing on the summary judgment motions. While "a conspiracy claim under
§ 1983 requires the proof of different elements than a conspiracy claim under § 1985(3)," Washington
v. Hall, 989 F.2d 508, 1993 WL 55948, *2 n.1 (10th Cir. March 1, 1993), "Section 1983 and § 1985
claims share a common element: a plaintiff must show some deprivation of a federally protected right
in order to be successful," Mitchell v. City of Moore, Oklahoma, 218 F.3d 1190, 1198 (10th Cir.
2000). The Court will, therefore, dismiss all conspiracy claims whether brought pursuant to § 1983
or § 1985. See Lee v. Federal Bureau of Prisons, 2000 WL 1478539, *6 n.8 (D. Kan. Sept. 22,
2000)("It is unclear whether defendant is asserting his conspiracy claims under § 1983, § 1985(3),
or both § 1983 and § 1985(3). The caption of plaintiff's complaint states that plaintiff is bringing a
claim against the Wisconsin defendants pursuant to § 1985(3). In plaintiff's response to the Wisconsin
defendants' motion to dismiss, however, plaintiff makes no mention of § 1985(3) in the section
entitled 'Conspiracy Claim.' In any event, as discussed below, plaintiff has failed to plead facts that
would support any type of conspiracy claim.").