**United States Court of Appeals for the Tenth Circuit**
OFFICE OF THE CLERK
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303)844-3157

Elisabeth A. Shumaker
Clerk of Court

Douglas E. Cressler
Chief Deputy Clerk

May 22, 2006

Mr. Matthew J. Dykman
Clerk
United States District Court for the District of New Mexico
333 Lomas NW, Suite 270
Albuquerque, NM 87102-2242

        Re:     04-2320, Jicarilla Apache v. Rio Arriba County
                Dist/Ag docket:  CIV-02-1470 JB/RLP

Dear Clerk:

        Enclosed are a certified copy of the judgment and a copy of
the opinion filed in this case which are issued as the mandate of
this court.  See Fed. R. App. P. 41(a).  Please file it in records of
your court.

        Please contact this office if you have questions.

                                Sincerely,

                                Elisabeth A. Shumaker
                                Clerk, Court of Appeals

                        By:
                                Deputy Clerk

clk:klp

cc:     Daniel I.S.J. Rey-Bear
        Jenny Joy Dumas
        Wayne H. Bladh
        R Galen Reimer
        Harriett J. Hickman

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

JICARILLA APACHE NATION,

       Plaintiff - Appellant,

v.

RIO ARRIBA COUNTY; MOISES
MORALES; ALFREDO MONTOYA, in
his individual capacity; RAY TAFOYA,
in his individual capacity; DAVID
SALAZAR, in his individual capacity;
LORENZO VALDEZ, Rio Arriba County
Manager; ARTHUR R. RODARTE, Rio
Arriba County Assessor; AGAPITO
CANDELARIA, Rio Arriba County Chief
Appraiser; and unknown John and Jane
Does; each such natural persons in both
his and her offical and individual
capacities; ANDREW CHAVEZ, Rio
Arriba County Commissioner; ELIAS
CORIZ,

       Defendants - Appellees.

No. 04-2320
(D.C. No. CIV-02-1470 JB/RLP)

A true copy
Teste
    Elisabeth A. Shumaker
    Clerk, U.S. Court of
    Appeals, Tenth Circuit
By
Deputy Clerk

## JUDGMENT

Filed March 1, 2006

Before **EBEL, HENRY** and **McCONNELL**, Circuit Judges.

This case originated in the District of New Mexico and was argued by counsel.

The judgment of that court is affirmed.

Entered for the Court
CLERK, COURT OF APPEALS

by: *[signature]*
Deputy Clerk

F I L E D
United States Court of Appeals
Tenth Circuit

March 1, 2006

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

JICARILLA APACHE NATION,

      Plaintiff-Appellant,

v.

RIO ARRIBA COUNTY; MOISES
MORALES; ALFREDO MONTOYA,
in his individual capacity; RAY
TAFOYA, in his individual capacity;
DAVID SALAZAR, in his individual
capacity; LORENZO VALDEZ,
Rio Arriba County Manager;
ARTHUR R. RODARTE, Rio Arriba
County Assessor; AGAPITO
CANDELARIA, Rio Arriba County
Chief Appraiser; and unknown John
and Jane Does; each such natural
persons in both his and her official and
individual capacities; ANDREW
CHAVEZ, Rio Arriba County
Commissioner; ELIAS CORIZ,

      Defendants-Appellees.

No. 04-2320

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. CIV-02-1470 JB/RLP)**

---

Daniel I.S.J. Rey-Bear (Jenny J. Dumas, Nordhaus, Haltom, Taylor, Taradash &
Bladh, LLP, Albuquerque, New Mexico, with him on the briefs), Nordhaus,
Haltom, Taylor, Taradash & Bladh, LLP, Albuquerque, New Mexico, for
Plaintiff-Appellant.

Harriet J. Hickman (R. Galen Reimer, Gallagher, Casados & Mann, P.C.,
Albuquerque, New Mexico, with her on the briefs), Gallagher, Casados & Mann,
P.C., Albuquerque, New Mexico, for Defendants-Appellees.

---

Before **EBEL**, **HENRY**, and **McCONNELL**, Circuit Judges.

---

**McCONNELL**, Circuit Judge.

---

Tax assessment is not an exact science, and the outcomes are rarely
popular. Using small budgets and limited information, local assessors must make
difficult judgments based on uncertain valuations—with the knowledge that
higher tax bills are more likely to produce complaints of unfair treatment than
thank you cards. Despite these limitations on exactingly precise tax assessment,
the Jicarilla Apache Nation ("Nation") believes that the Rio Arriba County
Assessor ("Assessor") violated the Equal Protection Clause in 2000 by changing
the tax classification on thousands of acres of the Chama Ranch ("Ranch"), an
upscale hunting resort in New Mexico owned by the Nation. In the year 2000,
after learning that the Nation purchased the Ranch for $25 million and that Ranch
income was largely derived from elk hunting and related activities, the Assessor
reclassified the Ranch from agricultural to miscellaneous non-agricultural, and
ceased to classify the elk themselves as livestock. The effect was to increase the
Nation's property tax bill by over $110,000 a year. The Assessor has not

-2-

reclassified any other properties in a similar fashion, even though some of them derive substantial income from similar elk hunting activities.

The Nation does not allege that the Assessor discriminated against Indians as a protected class. Instead, the Nation advances the theory that it is a "class of one" that has been subjected to "irrational and wholly arbitrary" treatment. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564-65 (2000) (per curiam). On this theory, the Nation brought 42 U.S.C. § 1983 and § 1985 claims against Rio Arriba County ("County") and a number of county officials. The Nation seeks to recover in damages the additional taxes attributable to the reclassification, and it asks for declaratory relief and an injunction preventing use of the classification in the future.

This is not the only lawsuit sparked by the novel interpretation of state tax law used by the Assessor to reclassify the land in question. The Nation appealed the reassessment on state tax law grounds, losing initially, prevailing in the New Mexico Court of Appeals, and ultimately losing before the Supreme Court of New Mexico. The combination of the difficulty of uniform tax assessment and the fact that the Assessor's reading of the state tax code was ultimately upheld by the state courts means that the Nation faces an imposing burden to show that the reassessment did not demonstrate the minimal competence necessary to avoid being "irrational and wholly arbitrary." We conclude that the Nation has not met

-3-

this burden and **AFFIRM** the district court's grant of summary judgment to the
Defendants.

I.

The Chama Ranch is a 32,075.80 acre property in Rio Arriba County,
located about one-quarter mile from the Nation's reservation. The Nation
purchased the Ranch in 1995 from the Chama Land & Cattle Company in a
bankruptcy sale. Within the Ranch are two state-licensed Class A game parks,
each encompassing 3,200 acres. For the years prior to tax year 2000, including
the years when the Ranch was under the Nation's ownership, the Assessor
classified this acreage as either agricultural grazing land (valued at $2 per taxable
acre) or irrigation land (valued at $55 per taxable acre). The Assessor also
classified the elk on the Ranch as livestock, a classification which entitled the
Ranch to favorable tax treatment.

In May 1996, the Nation sent a letter to the Bureau of Indian Affairs (BIA)
requesting that the United States acquire title to the Ranch in trust for the Nation
pursuant to 25 C.F.R. §§ 151.9-151.14. Should that happen, the Ranch would go
off the County tax rolls altogether. In June 1996, the County sent a letter to the
BIA objecting to the potential transfer of the Ranch's title. To explain why the
financial impact of the proposed transfer was greater than past tax assessments of
the property would suggest, the County stated that the assessment did not yet

-4-

reflect the Ranch's recent purchase price of $25 million or its current use as an elk hunting resort.

In October 1999, the BIA, after conducting an extensive review of the Nation's request, sent a letter to the Nation, with a copy to the County, approving federal trust acquisition of the Ranch. The County appealed this decision to the Interior Board of Indian Appeals (IBIA) of the United States Department of the Interior. In its appeal papers, the County noted that the acquisition would increase the land in Rio Arriba County held in federal trust from roughly 23 percent to 27 percent, and argued that the transfer would violate the Treaty of Guadalupe Hidalgo.[1]  Based on the $25 million price the Nation paid for the land, the County estimated that, after reassessment, property taxes for the Ranch would rise from roughly $21,000 per year to about $124,000 per year.

The reassessment process began in February 2000, when the Chief Appraiser of Rio Arriba County submitted a letter to the County Manager estimating that the property taxes on the Ranch after reassessment would be $151,914 for the 2000 tax year. The County submitted this estimate to the IBIA

---

[1] The Treaty of Guadalupe Hidalgo, which ended the Mexican-American War, reserved the property rights of Mexican citizens. *See* Christine A. Klein, *Treaties of Conquest: Property Rights, Indian Treaties, and the Treaty of Guadalupe Hidalgo*, 26 N.M. L. Rev. 201, 208-09 (1996). The County argued that the Ranch property is within the Tierra Amarilla Land Grant, and thus belongs to the Tierra Amarilla Land Grant heirs. This issue is not before the Court.

in support of its appeal. The Assessor then issued the Nation a valuation for the 2000 tax year, which classified 26,860.80 acres as miscellaneous non-residential (valued at $221.34 per taxable acre). The Nation appealed, claiming that the predominant use of the land was agricultural and that the reassessment violated state tax laws.

In the state court appeal of this reclassification, the Assessor justified his decision on the basis of the income and land use information contained in the October 1999 letter from the BIA. This letter suggested to the Assessor that the primary use of the property was recreational rather than agricultural. For example, the Assessor learned from the letter that in 1997 the Ranch derived $1,109,575 from what were considered non-agricultural sources such as lodging, other activities, and game animals, compared to $214,500 from what were considered agricultural sources such as cattle and timber. The Assessor also cited a July 2000 visit to the Ranch, the Ranch's website, and a promotional video to support the view that the primary use of the land was not agricultural. Throughout the litigation contesting the reassessment, the County has continued to tax the Ranch using the new classification. The BIA has not yet completed its acquisition of the land in trust.

### A.

The Nation appealed the reassessment of the Ranch to the Rio Arriba Valuation Protests Board ("Protests Board"). *See* N.M. Stat. Ann. § 7-38-25(A).

-6-

The parties stipulated to most of the facts and were able to distill the dispute to two basic questions of state law: (1) whether the Assessor should have continued to classify 27,040.80 acres of Ranch land as agricultural, and (2) whether the elk on the Ranch qualified as livestock.[2]

In February 2000, the Protests Board issued a decision and order rejecting the Nation's argument. The Protests Board concluded that the disputed land was used primarily as elk habitat, a non-agricultural use under state law. The Protests Board also concluded that revoking the classification of the elk as livestock was in accordance with state law. The Nation appealed the Protests Board ruling through the New Mexico state courts. The Court of Appeals agreed with the Nation and reversed the decision of the Protests Board, *see Jicarilla Apache Nation v. Rio Arriba County Assessor*, 92 P.3d 642 (N.M. Ct. App. 2003), but the New Mexico Supreme Court reversed the decision of the New Mexico Court of Appeals in September 2004, agreeing with the Protests Board that the reclassification for tax year 2000 was authorized under state law, *see Jicarilla Apache Nation v. Rodarte*, 103 P.3d 554 (N.M. 2004).

---

[2]The 2000 notice of valuation classified 26,860.80 acres of land at the Chama Ranch as miscellaneous non-residential, but the 2000 tax bill and the subsequent tax bills apply this classification to 27,040.80 acres. The difference of 180 acres is not explained.

## B.

The Nation filed this complaint in federal court in November 2002, after

the Protests Board rendered its decision but before the New Mexico Court of

Appeals issued its opinion reversing the Protests Board. Because the Nation

appeals a number of procedural issues, we recount in some detail the tortuous

path of this litigation. The complaint named as defendants Rio Arriba County,

three County Commissioners, the County Manager, the County Assessor, the

Chief Appraiser, and unknown persons in their individual and official capacities.

The complaint alleged that the Defendants violated the equal protection rights of

the Nation under color of state law in violation of 42 U.S.C. § 1983 and that the

Defendants conspired to violate the equal protection rights of the Nation in

violation of 42 U.S.C. § 1985. After the Defendants filed their answer, the parties

stipulated to a stay of discovery pending a ruling on the Defendants' soon-to-be-

filed motion to dismiss. Instead of moving to dismiss, however, the Defendants

filed a motion for summary judgment, claiming that the Nation could not prove

intentional discrimination and asserting a defense of qualified immunity for the

Defendants sued in their individual capacities. The Nation then filed an

unopposed motion pursuant to Federal Rule of Civil Procedure 56(f) to stay

consideration of the discriminatory intent issue pending discovery. It also filed a

cross-motion for summary judgment on qualified immunity.

-8-

The district court granted the Nation's Rule 56(f) motion, allowing the Nation to initiate discovery regarding discriminatory intent. Before the Nation completed its desired discovery, the Defendants moved to stay discovery until the district court ruled on qualified immunity. In response, the Nation argued that it should be allowed to continue discovery on the issue of intentional discrimination. The district court denied the Nation's request and, in the same order, granted the Defendants' motion asking the court to make a qualified immunity determination before permitting discovery on the intentional discrimination issue. In March 2004, the district court issued a brief order granting the Defendants' motion for summary judgment with respect to qualified immunity for the individual Defendants. In its order, the court indicated that it would later issue an opinion explaining the rationale for granting summary judgment. Subsequently, the district court suggested that the Defendants file a motion seeking a disposition on the remaining claims.

The Defendants then filed a second motion for summary judgment, which asserted that the Nation had not proved intentional discrimination. The Nation filed a second Rule 56(f) motion requesting that the court stay consideration of the second summary judgment motion pending an opportunity to conduct discovery on the factual issues raised in the Defendants' motion. The district court denied this motion but lifted the discovery stay and permitted the Nation to raise its discovery concerns at the hearing on the motion for summary judgment.

-9-

Thereafter, the Nation resumed discovery by reviewing documents at assessors' offices in Tierra Amarilla and Española. As the Nation attempted to begin taking depositions, the Defendants sought and obtained a protective order preventing the depositions from being taken. Several weeks after entry of that order, the district court issued a memorandum opinion explaining its previous grant of summary judgment on qualified immunity to the Defendants sued in their individual capacities. The district court also granted summary judgment to the Defendants sued in their official capacities and to the County. The Nation appeals both summary judgment orders, as well as the district court's refusal to withhold judgment pending discovery under Rule 56(f).

## II.

We begin by addressing jurisdiction. This Court had concerns that prior litigation in the state courts might have deprived us of jurisdiction to address retrospective relief under the *Rooker-Feldman* doctrine, as well as concerns that the Nation's claim for prospective relief was moot because of legislation enacted by the New Mexico legislature in April 2005. The parties submitted supplemental briefing on both points, which we address in turn.

### A.

The *Rooker-Feldman* doctrine limits the power of lower federal courts to review decisions of state courts. Parties aggrieved by decisions of state courts may obtain federal review only by writ of certiorari to the United States Supreme

Court, not by collateral litigation in federal district court. *See Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923); *D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462 (1983). At first blush, the doctrine might seem to apply in this case, since the state Protests Board and ultimately the state supreme court held that the Assessor's reclassification of the Ranch complied with state law. In effect, this lawsuit asks a lower federal court to reverse the result of a state court decision. In light of recent Supreme Court decisions limiting the scope of the *Rooker-Feldman* doctrine, however, we conclude that the doctrine is not applicable. In a footnote in *Verizon Maryland, Inc. v. Public Service Commission of Maryland*, 535 U.S. 635, 644 n.3 (2002), the Court held that *Rooker-Feldman* does not apply to judicial review of state agency decisions. This means that *Rooker-Feldman* does not insulate the decision of the Protests Board from review by a federal court. *See Jicarilla Apache Nation v. Rodarte*, 103 P.3d 554, 561 (N.M. 2004) (characterizing the Protests Board as a state agency). Moreover, the Court held in *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 125 S. Ct. 1517, 1521-22 (2005), that the *Rooker-Feldman* doctrine restricts federal jurisdiction only when the state court has rendered its decision "before the federal district court proceedings commenced." At the time this suit was filed in district court, the Protests Board had issued its order, but no state court had rendered a decision in

-11-

the case. The *Rooker-Feldman* doctrine, therefore, does not prevent this Court from exercising jurisdiction.[3]

## B.

After the decision by the New Mexico Supreme Court, and after the appeal was filed in this Court, the New Mexico legislature amended the tax statute in question. The new statute, passed in April 2005, expands the definition of "agricultural use" to include the "production" of "captive deer or elk." N.M. Stat. Ann. § 7-36-20(B). It also requires that tax assessors classify as grazing land any land that has "the production of captive deer or elk" as its "bona fide and primary use." N.M. Stat. Ann. § 7-36-20(D)(3). This statute resolves the underlying state tax questions for the future in the Nation's favor. It also renders this controversy moot insofar as the Nation seeks prospective injunctive relief for tax years after the effective date of the statute. Because it effectively restores the classification of the Ranch and the elk on the property to their pre-2000 status as agricultural land and livestock, respectively, the statute gives the Nation all that it sought to achieve through its injunctive action. Any claims the Nation may have about the future enforcement of the new statute are not ripe.

_____

[3]By not raising a res judicata defense the County has tacitly waived it. *See Kenmen Eng'g v. City of Union*, 314 F.3d 468, 479 (10th Cir. 2002). We decline to raise the defense sua sponte.

The Nation's claims for retrospective relief—namely. damages—in connection with the tax years before the statute's effective date remain a live controversy. *See Kirchberg v. Feenstra*, 450 U.S. 455, 459 n.6 (1981) (approving an appellate court's rejection of mootness for a claim that arose before an amended statute came into effect). Moreover, the effective date of the amended statute is disputed, and the County continues to classify the Nation's property under the unamended statute for the 2005 tax year. With respect to the 2005 tax year, therefore, injunctive relief may be appropriate and the Nation's claim seeking it is not moot. Accordingly, this Court has jurisdiction to consider the Nation's claims for damages, declaratory relief, and injunctive relief in connection with the tax years after the County's reassessment decision but before the County's application of the new statute to the Ranch.

### III.

We therefore turn to the merits. The Nation raises three issues. First, the Nation asserts that the district court erred by twice concluding that there was insufficient evidence of a constitutional violation to survive summary judgment. Second, the Nation argues that the district court erred in denying the Nation's motion for summary judgment on qualified immunity. Third, the Nation contends that the district court abused its discretion by denying the Nation's motions to stay adjudication pending further discovery on the subjective intent of the Defendants. All three issues turn, to one degree or another, on the class-of-one

-13-

theory advanced by the Nation. Accordingly, we begin our analysis with a review of the law governing this type of equal protection violation.

### A.

The Supreme Court formally recognized class-of-one equal protection actions in *Olech*, 528 U.S. at 564-65. In that case, a municipality conditioned water service for a property on the owner's granting a 33-foot easement, even though it required only a 15-foot easement from every other property owner. *Id.* at 563. The Supreme Court allowed an equal protection claim to survive a motion to dismiss because the municipality's demand was alleged to be "irrational and wholly arbitrary." *Id.* at 565. In a concurring opinion, Justice Breyer expressed "concern about transforming run-of-the-mill zoning cases into cases of constitutional right." *Id.* at 566 (Breyer, J., concurring in the result).

In the paradigmatic class-of-one case, a public official inflicts a cost or burden on one person without imposing it on those who are similarly situated in material respects, and does so without any conceivable basis other than a wholly illegitimate motive. *See Lauth v. McCollum*, 424 F.3d 631, 633 (7th Cir. 2005) (citations omitted):

> The paradigmatic "class of one" case, more sensibly conceived, is one in which a public official, with no conceivable basis for his action other than spite or some other improper motive (improper because unrelated to his public duties), comes down hard on a hapless private citizen. Perhaps he is the holder of a license from the state to operate a bar or restaurant or other business, and the official deprives him of a valuable property right that identically situated citizens toward whom the official bears no ill will are

-14-

permitted the unfettered enjoyment of. As one moves away from the
paradigmatic case, the sense of a wrong of constitutional dignity, and of a
need for a federal remedy, attenuates.

Most circuits, including this one, have proceeded cautiously in applying the

theory, sensitive to Justice Breyer's warning against turning even quotidian

exercises of government discretion into constitutional causes. *See, e.g., Jennings*

*v. City of Stillwater*, 383 F.3d 1199, 1210-11 (10th Cir. 2004). An approach that

reads *Olech* too broadly could transform the federal courts into "general-purpose

second-guessers of the reasonableness of broad areas of state and local

decisionmaking: a role that is both ill-suited to the federal courts and offensive to

state and local autonomy in our federal system." *Id.* at 1211. Such a pervasive

threat of federal litigation could straightjacket local governments that have

neither the capacity to document the reasoning behind every decision nor the

means to withstand an onslaught of lawsuits.

### B.

The Plaintiffs first argue that the district court erred in granting summary

judgment for the Defendants before the Plaintiffs had completed discovery

designed to uncover evidence that the Defendants' actions were motivated by

subjective ill will. We disagree.

The possibility of a requirement of subjective ill will has its origin in

Justice Breyer's concurrence in *Olech*. To avoid the prospect that class-of-one

cases could be overused, Justice Breyer emphasized the presence of an "extra

factor"—that the municipality bore some sort of subjective ill will toward the

class-of-one plaintiff. *Olech*, 528 U.S. at 566 (internal quotation marks omitted).

The majority, however, did not require subjective ill will and instead left it to the

circuit courts to give content to the phrase "irrational and wholly arbitrary."

Since *Olech*, this Court has struggled with the question whether class-of-one

claims require an allegation of subjective ill will. *See, e.g., MIMICS, Inc. v.*

*Village of Angel Fire*, 394 F.3d 836, 849 (10th Cir. 2005) (suggesting that a class-

of-one claim requires "'persecution due to some animosity'" but also finding

evidence that the official action was "objectively unreasonable" (quoting *Bartell*

*v. Aurora Pub. Sch.*, 263 F.3d 1143, 1149 (10th Cir. 2001)); *Jennings*, 383 F.3d at

1211-12 (noting the absence of allegations of ill will but basing the decision on

the plaintiff's failure to show that the official action lacked legitimate

justification"). Other courts have similarly divided on the question. *See, e.g.,*

*Racine Charter One, Inc. v. Racine Unified Sch. Dist.*, 424 F.3d 677, 683-84 (7th

Cir. 2005) (noting contradictory lines of cases in the Seventh Circuit and

reserving the question); *Bizzaro v. Miranda*, 394 F.3d 82, 88 (2d Cir. 2005)

(reserving the question); *Boone v. Spurgess*, 385 F.3d 923, 932 (6th Cir. 2004)

(not requiring proof of an illegitimate motive); *Shipp v. McMahon*, 234 F.3d 907,

916 (5th Cir. 2000) (requiring "illegitimate animus or ill-will"), *overruled on*

*other grounds, McClendon v. City of Columbia*, 305 F.3d 314, 322 n.4 (5th Cir.

2002) (en banc) (per curiam).

-16-

In this case, it is not necessary to resolve the issue. Even if subjective ill will is a *necessary* condition for a class-of-one claim, it is not a sufficient one. *See Barstad v. Murray County*, 420 F.3d 880, 887 (8th Cir. 2005); *Olech v. Village of Willowbrook*, 160 F.3d 386, 388 (7th Cir. 1998) ("[A] tincture of ill will does not invalidate governmental action."), *aff'd Olech*, 528 U.S. 562 (2000). If there was an objectively reasonable basis for the Defendants' actions in this case, the district court did not err in granting summary judgment in favor of the Defendants on that ground without allowing further discovery on the question of subjective ill will.

## C.

We proceed now to the merits of the district court's decision to grant summary judgment. Drawing all reasonable factual inferences in favor of the Nation, we consider (1) whether the defendants advanced grounds that are not "irrational and wholly arbitrary" for the County's decision to reassess the Chama Ranch without similarly reassessing other properties, and (2) whether the compared properties were similarly situated in every material respect. *See Jennings*, 383 F.3d at 1212-13. If we find either a rational basis for the treatment or a material difference between the properties, then summary judgment for the Defendants on the constitutional claim was appropriate. We consider these issues in turn.

-17-

1.

The Supreme Court has held state taxation policies unconstitutional under the Equal Protection Clause only when similarly situated properties were treated differently because of systematic policies, not because of individualized decisions. For example, in *Allegheny Pittsburgh Coal Co. v. County Commission of Webster County*, 488 U.S. 336, 338 (1989), the tax assessor had an established practice of valuing property on the basis of recent purchase price and making only small adjustments to properties that had not been sold recently. Over time, this practice produced "gross disparities" in generally similar classes of property, even though the state Constitution promised equal and uniform taxation of real personal property according to its value. *Id.* The Court found an equal protection violation because the disparities were massive, systematic, and persistent. *Id.* at 344-46; *see Nordlinger v. Hahn*, 505 U.S. 1, 16 (1992) (distinguishing *Allegheny Pittsburgh* and describing it as "the rare case where the facts precluded any plausible inference that the reason for the unequal assessment practice was to achieve the benefits of an acquisition-value tax scheme"). Because *Allegheny Pittsburgh* speaks to long-standing policies that produce systematic inequality, it has little bearing on an individualized assessment that was the first instance of a novel interpretation of state tax law ultimately upheld by the state supreme court. Systematic effects are not necessary in class-of-one cases, of course, but the

-18-

Court's willingness to scrutinize such entrenched inequality says little about second-guessing the daily decisions of individual tax assessors.

The Defendants offer several seemingly reasonable justifications for the Assessor's decision to reclassify only one property, the Ranch.[4] One such justification is that the Assessor had received a letter from the BIA containing unusually detailed information about the agricultural and non-agricultural income of the Chama Ranch and the recreational opportunities available to the Ranch's guests. The Defendants contend that this information, which was not available about other ranches, provided a reason for adjusting the classification of land at the Ranch, without doing so for other properties in the area.

The Defendants' stated reason certainly seems rational. Using information gained at little or no cost to an assessor is an effective way to value property without draining scarce resources. The letter was a bird in hand, and even a burdensome effort to solicit similar information from other properties might not

---

[4]At oral argument, the panel questioned counsel for the Defendants regarding an additional justification that had support in the record: that the Assessor's reassessment of the Chama Ranch was a test case which, if successful, would be followed by similar reassessments of other elk hunting properties. *See, e.g.,* Declaration of Wayne E. Quinlan, R. Vol. IV at 731 ("Based on my understanding of the tax dispute concerning the Chama Ranch, if Rio Arriba wins that dispute, the same sort of huge tax increase could also apply to my ranch and many other ranchers, too."). *Cf. United States v. Amon,* 669 F.2d 1351, 1361 (10th Cir. 1981) (Logan, J., concurring) ("Selective enforcement without malicious intent may be justified when a test case is needed to clarify a doubtful law . . . ."). Because the Defendants did not raise this as a justification for their action, we decline to consider it.

have revealed facts sufficient to support a change in land classification. The Equal Protection Clause imposes no duty under a class-of-one analysis to disregard costs or to ferret out information about other parties who may or may not be similarly situated. To ask state taxation officials to ignore relevant information that falls into their laps would hinder the already difficult job of property tax assessment.

The Nation argues that this reason for revaluing the Chama Ranch, but not other elk-hunting properties in the area, was pretextual. Because a class-of-one plaintiff must show that the official action was *objectively* irrational and abusive, however, pretext is not an issue. We ask not whether the Defendants' proffered justifications were sincere, but whether they were objectively reasonable. The Nation cites Equal Protection cases in which the courts considered the possibility of pretext, but these were all cases of alleged group-based animus. *See, e.g., City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 450 (1985). They cite no class-of-one cases on this point. For the same reasons we reject the Plaintiffs' argument that they were entitled to discovery on the issue of subjective ill will (see pages 16-17), we reject their argument that proof of pretext would be sufficient to render unconstitutional an otherwise objectively reasonable rationale for differential treatment, under a class-of-one theory.

The Nation suggests that the Defendants already had information about similar properties that would have supported changing those properties'

-20-

classifications from agricultural to miscellaneous non-residential. But the record contains no evidence that information comparable to the income and land use details in the BIA letter was available to the Assessor concerning similar properties when the decision was made to alter the classification of land on the Ranch. The Nation's brief claims that the Defendants were aware of similar properties since "at least 2000," Aplt. Br. 38, but because the only citation to the record justifying this assertion is a 2003 memo and printouts from the website of another ranch, also from 2003, we disregard this claim.

The Nation asserts that an internal memo from the Assessor's Office, dated February 3, 2003, demonstrates that the Defendants later became aware of a somewhat similarly situated elk hunting property, the Quinlan Ranch. It was proposed, within the Assessor's Office, that grazing land on the Quinlan property should be reclassified as miscellaneous non-residential, but for reasons unclear from the record, the Assessor decided against doing so. The Nation points to this memo as evidence that the Defendants engaged in intentional discrimination when they continued to apply the new classification scheme to the Chama Ranch, without applying it to the Quinlan Ranch. But as we have explained, it was neither irrational nor wholly arbitrary *at the time* to reclassify only the Nation's property, given the unique information in the BIA letter. When the internal memo was written, Defendants were in the midst of litigation before the New Mexico Court of Appeals on the legality of reclassifying elk hunting properties as non-

-21-

agricultural, *see Jicarilla Apache Nation v. Rio Arriba County Assessor*, 92 P.3d 642 (N.M. Ct. App. 2003). The Nation has suggested no reason why it was irrational for the Defendants to await the outcome of that litigation before pursuing similar cases.

**2.**

Another defect in the Nation's *Olech* claim is the lack of similarly situated comparators. The requirement that a plaintiff show that similarly situated persons were treated differently "is especially important in class-of-one cases." *Jennings*, 383 F.3d at 1213. Because the Supreme Court considered *Olech* on a motion to dismiss. it had nothing more than an allegation that the plaintiff was similarly situated to others. Since then, appellate courts have examined *Olech* claims at the summary judgment stage, where the factual record is more thoroughly developed. In such cases, courts have insisted that plaintiffs demonstrate similarity in all material respects. *See id.* at 1213-14; *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005). This requirement comports with the intuition that the degree of similarity an equal protection plaintiff needs to show will vary inversely with the size of the relevant class. If a plaintiff belongs to a large class, a systematic difference in treatment probably is not caused by individualized differences or statistical aberrations. But when the class consists of one person or entity, it is exceedingly difficult to demonstrate that any difference in treatment is not attributable to a quirk of the plaintiff or even to the fallibility of administrators

-22-

whose inconsistency is as random as it is inevitable. Accordingly, courts have imposed exacting burdens on plaintiffs to demonstrate similarity in class-of-one cases. *See, e.g., Jennings*, 383 F.3d 1214 (holding that it is "imperative for the class-of-one plaintiff to provide a specific and detailed account of the nature of the preferred treatment of the favored class"); *Neilson*, 409 F.3d at 105 (requiring a class-of-one plaintiff to show that "no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy"); *McDonald v. Village of Winnetka*, 371 F.3d 992, 1002 (7th Cir. 2004) (requiring that the other parties be "very similar indeed"); *Purze v. Village of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002) (insisting that a plaintiff demonstrate that the compared properties are "*prima facie* identical in all relevant respects").

This already substantial burden will be especially difficult to satisfy in the context of property tax assessment, where state actors must make highly contextual judgments about the worth of property. The difficulty of comparing properties means that there may be material distinctions between allegedly similarly situated parties, as well as a ready supply of rational and not wholly arbitrary reasons for differential treatment. Thus, the Nation cannot prevail if there is *any* material difference between it and allegedly similarly situated parties that relates to a governmental interest.

-23-

The Defendants distinguish the Chama Ranch from other elk hunting ranches because it offers more lodging options and outdoor activities. They assert that the Chama Ranch offers guests not only elk hunting but also hiking, fishing, cross-county skiing, skeet shooting, and other pursuits, which together are sufficient to distinguish the properties for a class-of-one claim. The Nation disputes this distinction, arguing that differences in lodging should not be considered for classifying hunting land. If its lodge is excluded, the Nation contends, no distinction remains between its elk hunting land and the elk hunting land of other ranches. Yet this argument ignores the additional recreational activities, all non-agricultural, that take place on the Nation's land. The hiking, fishing, cross-country skiing, skeet shooting, and similar pursuits presumably take place outside of the lodge. Nothing in the record suggests that the other ranches offer the same breadth of activities. Indeed, the declarations submitted by owners of other hunting ranches indicate a different business model. None of the other ranches serves outdoor enthusiasts of wide variety of interests. Of these four other properties, three offer only elk hunting and one, the Mundy Ranch, also offers fishing.

These differences are sufficient to distinguish the Chama Ranch from the other allegedly similarly situated properties. The additional outdoor activities offered at the Ranch arguably give the land a different character for tax assessment purposes. The Chama Ranch might draw higher-paying customers and

-24-

its diversification could make its income more consistent over time. Put another way, there are rational reasons to believe that this land generates more income, and is thus more valuable, than the land on the allegedly similarly situated properties. Taxing higher-value land at a higher rate is a legitimate interest for an assessor. Given this legitimate interest and the differences between the Chama Ranch and the other properties, we cannot agree with the Nation's argument that the other parties are sufficiently similarly situated to sustain a class-of-one claim.

## IV.

Having concluded that the reclassification is not a constitutional violation, we consider the remaining issues in this case. We need not determine whether the law was clearly established with respect to the Defendants sued in their individual capacities, because the lack of a constitutional violation makes it unnecessary to further address qualified immunity. *See Butler v. Rio Rancho Pub. Sch. Bd. of Educ.*, 341 F.3d 1197, 1200 (10th Cir. 2003). We also need not address the Nation's appeal of the order denying further discovery on subjective ill will, because the class-of-one claim fails on other grounds, namely that the Defendants' actions were not "irrational and wholly arbitrary" and that the other ranches were not similarly situated. Further discovery would therefore be futile. *See DeVargas v. Mason & Hanger-Silas Mason Co.*, 911 F.2d 1377, 1393 (10th Cir. 1990) (finding no abuse of discretion where the district court denied further discovery because further factual development was unnecessary). Finally, we

-25-

note that our ruling on the § 1983 claim disposes of the Section 1985 claim. The latter claim requires that the Nation demonstrate it was "injured as a result of a conspiracy to deprive any person [of] equal protection of the laws." *Ford v. West*, 222 F.3d 767, 772 (10th Cir. 2000). If there was no equal protection violation there was no § 1985 claim. Section 1985 prohibits conspiracies to deprive persons of equal protection, not conspiracies to engage in rational taxation. Accordingly, the judgment of the district court is **AFFIRMED.**

-26-